NEW YORK CENT. & H. R. R. CO. v. GENERAL ELECTRIC CO.
(No. 69-44.)

(Supreme Court, Appellate Division, Third Department.   May 5, 1915.)

1. CARRIERS ☞35—CONTRACTS—UNDUE PREFERENCE—BURDEN OF PROOF.
    Where a contract between a carrier and a shipper grew out of a course of dealing long continued, and was not within any of the mischiefs which a statute aims to obviate, the contract is entitled to consideration in arriving at a proper construction thereof, and the burden of showing that it violates the statute or constitutes an undue preference is on the party asserting it.
    [Ed. Note.—For other cases, see Carriers, Cent. Dig. § 94; Dec. Dig. ☞35.]

2. CONTRACTS ☞153—VALIDITY—GOOD FAITH OF PARTIES.
    Good faith of the parties to a contract is essential to its validity, and when good faith is not questioned, and the parties have made a contract, the courts will not by strained construction render it void.
    [Ed. Note.—For other cases, see Contracts, Cent. Dig. § 734; Dec. Dig. ☞153.]

3. CARRIERS ☞88—FREIGHT IN CAR LOAD LOTS—DELIVERY—ACTS CONSTITUTING.
    Transportation of freight by a carrier in car load lots includes the placing of a car at a point convenient for unloading on a private siding or a track of the carrier.
    [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 280-289½, 319-321; Dec. Dig. ☞88.]

4. CARRIERS ☞35—CONTRACTS BETWEEN CARRIER AND SHIPPER—VIOLATION OF INTERSTATE COMMERCE ACT.
    A contract by a carrier to pay a shipper 20 cents per ton for the shipper "spotting" cars on its own track is a contract for the performance by the shipper of a duty which the carrier owes to place each car so that it can be unloaded, and in the absence of anything to show that the service performed by the shipper is not worth the agreed price, the contract does not provide for the payment of a rebate, in violation of Interstate Commerce Act Feb. 4, 1887, c. 104, 24 Stat. 384, but is within section 15 thereof inserted by Act June 29, 1906, c. 3591, 34 Stat. 589 (U. S. Comp. St. 1913, § 8583), providing that, where the owner of property transported under the act directly or indirectly renders any service connected with the transportation, an allowance therefor shall be no more than is just and reasonable.
    [Ed. Note.—For other cases, see Carriers, Cent. Dig. § 94; Dec. Dig. ☞35.]

5. COMMERCE ☞89—INTERSTATE COMMERCE COMMISSION—JURISDICTION OF COURTS.
    The mere fact that the Interstate Commerce Commission in refusing to act under the Interstate Commerce Act, in behalf of a shipper having a contract with a carrier requiring the latter to pay the shipper a specified sum for spotting cars on its own track, does not prevent the court, in an action on the contract, from adjudging it valid under the Interstate Commerce Act and enforcing it.
    [Ed. Note.—For other cases, see Commerce, Dec. Dig. ☞89.]

    Howard, J., dissenting.

Appeal from Trial Term, Schenectady County.

Action by the New York Central & Hudson River Railroad Company against the General Electric Company. From a judgment of the Supreme Court, Trial Term (83 Misc. Rep. 529, 146 N. Y. Supp. 322), for plaintiff, and dismissing the counterclaim of defendant, defendant appeals. Reversed, and judgment directed for defendant on its counterclaim.

Argued before SMITH, P. J., and KELLOGG, LYON, HOWARD, and WOODWARD, JJ.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Richard D. Moot, of Schenectady, and Adelbert Moot, of Buffalo, for appellant.

Visscher, Whalen & Austin, of Albany (Lewis E. Carr, of Albany, of counsel), for respondent.

WOODWARD, J.   The plaintiff brought this action to recover the sum of $618.53, freight charges.  The defendant admitted the material facts, but set up a counterclaim for $114,880.73, with interest for several years last past, under the terms of a contract by which the plaintiff agreed to pay to the defendant one cent for each 100 pounds of incoming and outgoing freight handled by the defendant.  In the plaintiff's reply to the defendant's amended answer, it is admitted that the bills of the defendant from 1894 to 1905, with one exception, were paid, and that the bills since that time have not been paid, and it does not appear to be seriously questioned that the contract was good at common law.  The real question at issue is whether this contract, concededly entered into in good faith in 1894, and subsequently modified, is a valid obligation under the laws of the United States in respect to interstate. commerce. There are no disputed questions of fact, and we are here to determine merely whether a contract based on business principles, mutually advantageous to the parties, runs counter to the law.

In the year 1887 the defendant moved its plant to the city of Schenectady and acquired 11 acres of land and two buildings.  These premises were adjacent to the Delaware & Hudson Company's railroad tracks, which company operated a siding about 1,500 feet in length into the property of the defendant, and for a considerable time by the use of its own motive power placed cars for the defendant in positions to be conveniently loaded or unloaded; this process being known as "spotting."  The plaintiff had no access to the premises at the time, and incoming and outgoing freight on the plaintiff's lines was spotted by the Delaware & Hudson Company's locomotives, for which the latter company made a uniform charge of $1 per car; this charge being absorbed by the plaintiff as a part of its transportation —that is, the New York Central & Hudson River Railroad Company made a flat rate to Schenectady, and it recognized that a part of its duty in transporting freight to and from Schenectady was the spotting of cars upon the premises of the defendant.  It was never suggested, so far as appears, that its duty was completed by merely running these freight cars off from its right of way and placing them upon the siding within the defendant's premises; it recognized that its obligation ended only with the spotting of the cars—the placing of them at convenient points for loading or unloading.  Not having the facilities for performing this duty of transportation, it entered into a contract with the Delaware & Hudson Company to complete the work, making no extra charge to the shipper.  This arrangement, by which the defendant afforded yard facilities, in a measure for its own convenience, and the plaintiff furnished the means of properly spotting the cars upon the defendant's own premises, does not appear to be open to any objection; it was the usual and customary

method of handling business at Schenectady, except that in cases where the plaintiff's own lines reached a siding upon private property it performed the service of spotting cars with its own motive power, instead of employing the Delaware & Hudson Company.

With the growth and development of the defendant's plant, the premises were increased from time to time, until at present there are about 150 acres within the fences, with something like 12 miles of standard track, interlaced with narrow-gauge tracks, for the purpose of moving heavy freight from building to building within the plant. With this enlargement of the territory covered by the plant has come a siding connecting the plaintiff's railroad lines with the defendant's tracks within the plant, and the movement of freight aggregates about 100 cars each way per day. The defendant furnishes the yard facilities for the handling of this vast quantity of freight. In addition to this, it has from time to time put on new locomotives, until now six locomotives are in constant use in spotting freight and in doing the interplant work of the company. These locomotives were purchased and put into use under the provisions of the contract between the plaintiff and defendant, by which the former undertook to place its cars upon the defendant's tracks within the latter's yards, and the defendant, for a consideration of 20 cents per ton, was to separate the cars and spot them for loading and unloading, as had previously been done by the Delaware & Hudson Company.

The plaintiff, in its defense to the defendant's counterclaim, contends that it has performed its contract of transportation in delivering these 100 cars, more or less, incoming upon the defendant's siding within its plant, and it taking the same number of cars from such siding, and placing them in trains upon its own right of way; that is, while it spots cars for other persons and corporations owning sidings within their own plants in the city of Schenectady, that in reference to the defendant it has performed its duty when it has gathered into trains and has deposited upon the interchange siding of the defendant the aggregate number of cars incoming, and has taken from such siding the loaded or empty cars outgoing. It should be remembered that under the evidence it appears that these cars are gathered into trains twice each day and placed. This means that two trains of 50 cars each are brought upon the defendant's premises every day, and that an equal number go out. A train of 50 cars requires well up towards half a mile of track for its accommodation, and to suggest that this bunching of a train of cars upon a particular side track is a complete delivery of this freight, in a community where the plaintiff is in the habit of spotting cars for its other customers, is little less than absurd. This interchange track, it is true, is the place of delivery agreed upon in the contract, and the defendant there breaks the seals for the purpose of determining the proper location of the freight; but this same contract provides that the defendant shall be paid 20 cents per ton for completing the transportation—for spotting the cars. In other words, except for the contract it would be the duty of the plaintiff to place each car load of freight in a position where it could be conveniently unloaded. It would owe this duty to an incidental consignee, and it would

be called upon to place the car upon its own tracks at a convenient point for this purpose, and to afford a reasonable opportunity for unloading. The duty could not be performed by placing a half a mile of cars upon a siding, and compelling the consignee to draw the goods the whole length of the train, where it was reasonably convenient to place the car within a short distance of the actual place of final delivery. The defendant, by providing its own tracks upon its own ground, does not forfeit the rights of the incidental shipper. It still has a right to have the cars placed where they can be loaded and unloaded conveniently. Anything less than this is a discrimination against the defendant, and the purpose of the statute is to produce equality between all shippers or receivers of transportation service.

[1] The contract by which the plaintiff undertook to pay to the defendant the cost of spotting cars is in no sense a rebate; it is merely contracting with the defendant to perform that portion of the transportation which is involved in placing the cars conveniently for loading and unloading, as is done with every shipper in that particular locality, and is merely a continuation, under another form, of the original arrangement by which the Delaware & Hudson Company had performed a like service for the plaintiff. Where a contract grows naturally out of a course of dealing long continued, and not within any of the mischiefs which a statute aims to obviate, it is entitled to great consideration in arriving at the proper construction to be placed upon the particular instrument, and the burden of showing that such contract is in violation of the statute, or constitutes an undue preference, is upon the party asserting the proposition. Interstate Commerce Commission v. Baltimore & Ohio Ry. Co. (C. C.) 43 Fed. 37.

[2] There could be no question in the first instance that the plaintiff had a right to contract with the Delaware & Hudson Company for placing freight upon the defendant's premises and spotting the cars as a part of its duty of transportation, so long as a like service was performed for all other shippers similarly situated. When the plant developed, and the plaintiff could reach the premises over its own tracks, it still had a right to perform the service of spotting the cars; it was its duty to do this, both for the defendant and all other shippers, and the service which it was bound to afford as a common carrier it could hire the defendant to perform, so long as this contract did not afford the cover for a mere rebate. Good faith is essential to all contracts (Industrial & General Trust, Limited, v. Tod; 180 N. Y. 215, 225, 73 N. E. 7); but when this is not brought into question, and the parties have entered into an agreement, it is not the province of the courts, by strained construction, to render the contract void.

[3, 4] There is no suggestion here that the service performed by the defendant in spotting the cars is not worth the agreed price, or that it is entered into with any purpose of bringing about an undue preference; but the plaintiff stands upon the bald proposition that the contract is in violation of the provisions of the statute to regulate commerce, and refuses performance of its obligations solely upon this ground. This view of the question has been taken by the learned trial court, and it seems to us entirely clear that this is error; that the effect of this determination, if it is permitted to stand, is to deny to the defendant

the same quality of service which is rendered to others in the same locality at the same price. Entirely apart from the contract now under consideration, it would be the duty of the plaintiff to deliver each of the 100 cars daily arriving to the defendant in a position where they could be conveniently unloaded. As a common carrier it would be bound to supply sufficient tracks, sidings, and facilities for handling the volume of business necessary to the defendant's business, and, as we have already suggested, this duty could not be performed by merely placing a string of 50 or 100 cars upon a siding. It would be bound to place each car at a convenient point for unloading, and probably to furnish the necessary cranes, etc., for the work, or at least to provide the necessary space for the use of such appliances as were required in the handling of the class of freight involved.

The plaintiff could not close its eyes to the necessities of the situation; it would be bound, not only to provide for the handling of the cars on one day, but upon all days, and to this end it would have to make provision for the prompt discharge of the freight. It would be obliged to afford the facilities for such work, or fail in the discharge of the duties of a common carrier. But it happens that the large volume of business transacted by the defendant warrants it in relieving the plaintiff of a portion of this burden. It finds that by providing its own tracks and locomotives it not only makes room for the handling of the freight, but it facilitates its own business, by being able to handle the cars at will, instead of being obliged to await the operations of the plaintiff's locomotives in placing cars for all its patrons on an equal basis. This does not relieve the plaintiff, however, from the duty of affording equal facilities, so far as practicable, to the defendant; it does not change the rules determining what constitutes transportation, and we believe it may be laid down broadly that transportation by railroad of car load lots, under present-day conditions, requires the convenient placing of the car for loading, and an equally convenient placing of the car for unloading, and that the mere question of whether the tracks are upon the property of the shipper or upon the right of way of the transportation company is of no consequence upon this point.

Primarily it is the duty of the transportation company to afford sidings and the convenient place of loading or unloading and the proper placing of the cars. If the shipper furnishes the sidings, it does not relieve the transportation corporation of the duty of conveniently placing the cars, and the mere fact that the physical conditions are such that the transportation company is not able to use the shipper's sidings for the accommodation of other shippers does not change the relations. The facilities furnished by the shipper relieve the demand upon the other resources of the transportation corporation, and thus indirectly contribute to the general efficiency of the transportation service, so that there is little force in the attempted distinction between shippers whose tracks are made use of in reaching other shippers and those of the defendant in the instant case. It must be entirely obvious that the plaintiff could not, without a vast outlay of capital, take care of the freight business of the city of Sche-

nectady if it were compelled to furnish the necessary terminal facilities for handling the freight of the defendant. It would, undoubtedly, require much more space and a far greater exertion of traction energy for the plaintiff to properly handle the 100 cars each way each day in a general yard, mingled with the freight of other shippers, than under the present arrangement. Every shipper is interested in the matter. The more conveniently and rapidly the freight is handled, the better for all concerned; and if the defendant, by receiving its cars at a given point and taking them entirely out of the general traffic, can thus relieve the plaintiff of the necessity of handling it in connection with the consignments to other shippers, there can be no reasonable question that it is contributing to the general efficiency of the service and to the facilities of transportation, without working any inequality to any one.

[5] Section 15 of the act to regulate commerce, inserted by the act of 1906, clearly recognizes the principle involved, and the mere fact that the Interstate Commerce Commission, in refusing to act under the provisions of that act in behalf of the defendant, has apparently held contrary to the defendant's present contention, does not prevent this court, in an action upon this contract, recognizing the law in its true construction. The section cited provides that "if the owner of property transported under this act directly or indirectly renders any service connected with such transportation, or furnishes any instrumentality used therein, the charge and allowance therefor shall be no more than is just and reasonable," which is equivalent to saying that such just and reasonable charge and allowance may be made where such services are rendered. Indeed, without such charge and allowance, there must result an inequality of conditions to the shipper who furnishes such service or affords such instrumentalities, and this is the real purpose sought to be avoided by the statute here under consideration. The transportation company, in its contract of carriage, undertakes to perform all of the duties of a common carrier, to perform an equal service for all upon substantially the same terms and conditions—that is, the essence of the contract of a common carrier. If one shipper affords instrumentalities, such as cars, locomotives, yard space, tracks, etc., while another is afforded all of these things by the transportation corporation, there is an inequality. It costs the one shipper much more than the other to accomplish the same results, and the law never contemplated this. Indeed, the evil sought to be obviated in the enactment of the act to regulate commerce was the discrimination which existed among shippers and between localities. It was charged, and in many cases established, that the railroads of the country were, by discrimination in rates and facilities, building up one line of enterprises at the expense of others, were creating industrial communities in one location and preventing them in others, as the interests or caprice of the management dictated, and the statute in question was enacted to bring about a full performance of the duties of common carriers, not to work an injustice between shippers and the transportation corporations by preventing an intelligent apportionment of the transportation services between them,

where co-operation conduced to the benefit of each and to the public in general.

Assuming, what no one questions, that the payment of 20 cents per ton for the spotting of cars upon the defendant's premises is a fair and just proportion of the flat rate of transportation fixed for the city of Schenectady, the plaintiff is bound by the broad rules governing the duties of a common carrier to make this payment to the defendant, just as it was in the early days of the development to pay a similar charge to the Delaware & Hudson Company for performing this part of the transportation service, and the statute nowhere runs counter to this construction. As pointed out above, it practically requires this by the provisions of section 15, and such a construction ought to be put upon a statute as will best answer the intention which the makers had in view, for "qui hæret in litera, hæret in cortice. Bacon says that:

"In order to form a right judgment whether a case be within the equity of a statute, it is a good way to suppose the lawmaker present, and that you have asked him this question: Did you intend to comprehend this case? Then you must give yourself such answer as you imagine he, being an upright and reasonable man, would have given. If this be that he did mean to comprehend it, you may safely hold the case to be within the equity of the statute; for, while you do no more than he would have done, you do not act contrary to the statute, but in conformity thereto." Riggs v. Palmer, 115 N. Y. 506, 510, 22 N. E. 188, 5 L. R. A. 340, 12 Am. St. Rep. 819.

Can there be any question that, if the Legislature of this nation had seen the situation at Schenectady, they would have sanctioned such an arrangement as exists under the contract between the parties to this action? Is there any reasonable doubt that it has provided for this exact situation? It cannot be presumed, in a statute designed to bring about equality between shippers and communities, that the Legislature has provided a scheme which prevents the consummation of such equality, and any construction which brings about such a result should be avoided, unless the language is direct and positive. We are of opinion that nothing in the statute demands such a construction, that it is just and lawful for the plaintiff to contract in good faith with the defendant for the completion of the service of transportation, and that no right of any shipper, or of the public, is prejudiced by such a contract. On the contrary, we believe that considerations of public policy, as evidenced by the act to regulate commerce and the various supplemental and amendatory acts relating thereto, require that this contract should be approved. It certainly cannot be the policy of the nation to prevent the most economical production of manufactured goods, or to compel the defendant to cart its vast shipments from cars placed upon the plaintiff's own side tracks remote from defendant's works; nor does there appear to be any good reason why the plaintiff should be compelled to furnish the locomotive equipment necessary to place this freight, in the performance of its duties as a common carrier, where the defendant finds it more economical, and better adapted to its own work, to furnish the necessary facilities, which may be used betimes for the interplant movement of freight. The whole arrangement appears to have been

worked out as a rational business proposition, equally advantageous to both parties to the contract, without prejudice to the rights of any one, and the only legitimate question which could be raised was the fairness of the contract. Of course, if it merely served the purpose of covering up a rebate, if its purpose was to avoid the equality provisions of the law, a different question would be presented; but, where the shipper in good faith performs a part of the service of transportation, there is no reason in law or justice why he should not be paid for such service. The judgment appealed from should be reversed, and judgment directed for the defendant on its counterclaim.

Judgment reversed, with costs and judgment directed for the defendant on its counterclaim, with costs. All concur, except HOWARD, J., who dissents.

JOHN M. KELLOGG, J. (concurring in result). A contract for transportation of freight includes its reasonable delivery. Reasonable delivery depends upon the conditions existing at the place where the delivery is to be made. Ordinarily the small dealer or manufacturer receives and delivers his freight at the railroad company's warehouse, docks, or sidings. The manufacturer, who from time to time receives or ships car loads of freight, arranges with the company for a siding, and the freight is delivered at the consignee's siding, or at a particular factory within his works. Under ordinary circumstances such delivery is reasonable, and, being generally accorded, it may be required by all similarly situated. By making such deliveries the company does not, however, bind itself to do the impossible, or to make deliveries at other factories where the conditions make such delivery impracticable.

Within the defendant's fences are 150 acres of land, with 50 or 60 large buildings and many smaller ones, in all about 140, with a narrow-gauge railroad running crosswise. It is manifestly impracticable that the plaintiff bring into and take out of these works 100 cars per day, with the necessary sorting, shunting, switching, weighing, and delivery, and move each car from the different places as required. If it attempted such a task, it would to a great extent deprive the defendant of the use of its works, and lead to many accidents, delays, and much confusion. Both the plaintiff and the railroad company cannot occupy the inclosure at the same time. Evidently the defendant is not in a position to require or desire the plaintiff to spot all cars within the works, and the plaintiff is not in a position to do the work, and does not desire to do it. It would be impracticable for the plaintiff to deliver and receive the defendant's freight as required in its railroad yard, or upon its railroad platforms, or upon sidings upon its grounds. It would require a large addition to plaintiff's yard facilities, carrying with it a very great expense, and throw upon it many burdens, and be a great detriment in its general service to the public. If it attempted such impossible service, the result would be intolerable to the defendant.

We have, therefore, a condition where, to require the plaintiff to perform in detail all the service which it performs for many other shippers is not desired and could not be tolerated, either by the plaintiff or the defendant. The magnitude of the works requires special

consideration and some plan of operation which will be reasonable and just to both parties. Each party, therefore, if it stands strictly upon its supposed legal rights, will involve itself and the other in very large and unnecessary expense and trouble. Neither, however, is required to yield to the other. Common sense dictates that the parties should get together and meet the situation as it is, with the best and most reasonable adjustment which the situation permits. They must consider the service to be performed and the duty which each owes to the service. They have made an adjustment, mutually satisfactory. It is clearly legal, unless it involves a hidden rebate. Clearly the plaintiff cannot be required to pay the entire expense of spotting the cars, as under the circumstances it is not required in the fullest sense to do so. Neither can the defendant require payment for all it costs to perform the service, because the service is such that a part of it properly falls upon it and is done in part for its accommodation. If the defendant receives the loaded cars at the sidings, and returns the empty cars or cars reloaded with outgoing freight at the siding, it is manifestly performing a service, some of which is for the benefit of the defendant and is embraced within the contract of transportation, and such service is of great value to the plaintiff.

There is nothing before us to show that the amount agreed upon is excessive under the circumstances. The agreed rate has been filed with the Commission and acted upon. If the Commission has held that the railroad company can make no payment for such services, we disagree with it, and hold that a reasonable compensation under all the circumstances should be made. It therefore seems that until the Commission, by affirmative action, recognizes the fact that some compensation is to be made, and determines that the amount agreed upon is excessive, and in substance a rebate, the plaintiff's liability is clear.

I therefore concur in the result.