OPINION OF THE COURT
Michael J. Dontzin, J.
The underlying action is one in which the plaintiffs chai *31 lenge foster care placements for New York City children, who have been placed in out-of-State institutions as being violative of sections 374-a and 398 (subd 6, par [g]) of the Social Services Law. The plaintiffs seek class certification, declaratory and injunctive relief, continuing jurisdiction by the court of the class, damages, attorney’s fees and other costs.
The relevant facts for purposes of this hearing are that plaintiffs, Sinhogar and Morgan (pseudonyms) are emotionally disturbed children in need of care and treatment, who while in the care of the New York City Department of Social Services were sent by City Social Services to institutions in Roanoke, Virginia (Edgemeade), and Hialeah, Florida (Montanari).[1]
Plaintiff Evans is a mentally retarded child, who at the commencement of this action, was allegedly in need of adequate and appropriate placement outside the home, but was not offered any unless he accepted out-of-State placement, in what is characterized by the complaint as an institution for the mentally ill and defective. Since the commencement of the action he has been placed in a facility in Vinewood, New Jersey, but by stipulation between the relevant parties, his rights to placement in a New York facility convenient for family visits has been preserved.
Plaintiffs Sinhogar and Morgan charge that they were placed in institutions not supervised by the New York State Board of Social Welfare; that these institutions do not provide adequate treatment and care, with the result that they are confined under conditions that endanger their physical and psychological well-being.[2]
*32 The plaintiffs seek to represent approximately 300 children, whom the defendants, the city’s Department of Social Services and the Commissioner of the State Department of Social Services, have placed in out-of-State residential institutions.[3]
At this juncture the court has before it the following proceedings:
Plaintiff’s motion for class action status (CPLR 901 et seq.) and partial summary judgment; a motion on behalf of the defendant, Commissioner of the New York State Department of Social Services, to dismiss the complaint on the ground that no cause of action has been stated upon which relief can be granted (CPLR 3211, subd [a], par 7); a motion on behalf of the defendant, State Commissioner of Social Services, to substitute the Commissioner Barbara B. Blum in place of Philip Toia, and a motion to dismiss the complaint personally, as to the defendant Toia.
The relief requested by plaintiffs, other than for class action designation, is predicated on contentions that the placements:
(a) are violative of section 398 (subd 6, par [g]) of the Social Services Law;
(b) are not in conformance with the requirements of the Interstate Compact on the Placement of Children (Social Services Law, § 374-a, subd 8);
(c) are violative of the equal protection clauses of both the United States Constitution and the Constitution of the State of New York;
(d) are in derogation of their right to treatment; and
(e) constitute an unlawful delegation of authority.
CLASS ACTION
On careful analysis of the issues of law and fact involved here, the court is of the opinion that class action status is not warranted.
The class and subclass which the plaintiffs seek to represent are a large group which present numerous problems involving questions of consent and absence of consent to placement; differences of receiving institutions; differences in the primary *33 purpose and circumstances of placements, etc. In short, the proposed class is too unwieldy and a class action is not superior to the other available methods of litigation.
Furthermore, and perhaps more important, class action status under the circumstances here is unnecessary. The rule has evolved that class action is unnecessary and an abuse of discretion where governmental operations are involved, in that the granting of any relief will result in comparable relief flowing to others similarly situated under the principle of stare decisis (Matter of Rivera v Trimarco, 36 NY2d 747). This judicial doctrine was reaffirmed in Matter of Jones v Berman (37 NY2d 42). (See, also, Matter of Lavine, 39 NY2d 72; Baumes v Lavine, 38 NY2d 296, 306; Matter of Spoor v Berger, 57 AD2d 685; Matter of Adkin v Berger, 50 AD2d 459.) The fact that the individuals in the purported class may be so incapacitated as to be incapable of bringing a legal action to protect any rights that may inure to their benefit from this lawsuit is not reason enough to grant class status. It may be assumed that a governmental body, unlike the private sector, will see to it that their interests will be protected, without their having to initiate any action (see Matter of Martin v Lavine, supra, p 75; Galvan v Levine, 490 F2d 1255, cert den 417 US 936).
(social services law, § 398, subd 6, par [g] and § 374-a, SUBD 8)
Plaintiffs’ motion for partial summary judgment on the grounds that the out-of-State placements violate the express statutory prohibitions of section 398 (subd 6, par [g]) of the Social Services Law and that the placements are not provided for under section 374-a is denied on the ground that a question of fact exists as to whether or not the institutions involved in this lawsuit come within the exclusions of subdivision (d) of article 2 of the Interstate Compact on the Placement of Children (I. C. P. C.). (Social Services Law, § 374-a, subd 1.)
Turning first to the question of judicial interpretation of the statute, the Interstate Compact on the Placement of Children opens up a wide range of appropriate foster care placements for New York children through the creation of a regional and national network of services. The substance of the compact is contained in subdivision 1 of section 374-a of the Social *34 Services Law, and the enabling provisions of New York’s participation in the compact are in subdivisions 2 to 10.
Section 398 of the Social Services Law, which concerns the "powers and duties of commissioners of public welfare and certain city public welfare officers in relation to children,” provides that those officials have the power, as to destitute, neglected, abused, abandoned, delinquent, defective, physicially handicapped, and illegitimate children, to place such children in authorized homes and institutions in New York and adjoining States, but as to the latter, only in institutions maintained by a child care agency incorporated in New York, and visited, inspected and supervised by the New York State Board of Social Welfare (Social Services Law, § 398, subd 6, par [g]).
The original purpose of the statute was to prevent a number of abuses which were incidental to the out-of-State placement of children. With the enactment of the I. C. P. C. (Social Services Law, § 374-a, subd 1) the Legislature specifically exempted out-of-State placements made pursuant to the I. C. P. C. from the prohibition of section 398 (subd 6, par [g]) of the Social Services Law. Subdivision 8 of section 374-a of the Social Services Law specifically provides: "8. Neither the prohibition of, nor the limitations on out of state placement of children contained in sections three hundred seventy-four and three hundred and ninety-eight of this chapter shall apply to placements made pursuant to the interstate compact on the placement of children.”
We come then to the question as to whether or not these placements involved here are placements within the meaning of the I. C. P. C. and therefore are not controlled by section 398 (subd 6, par [g]). The plaintiffs claim that these placements are not covered by the I. C. P. C. because they were made to institutions which care for the mentally ill or mentally defective, citing subdivision (d) of article 2 of the I. C. P. C. which provides: "(d) 'Placement’ means the arrangement for the care of a child in a family free or boarding home or in a child-caring agency or institution but does not include any institution caring for the mentally ill, mentally defective or epileptic or any institution primarily educational in character, and any hospital or other medical facility.” (Emphasis supplied.)
At first blush it would appear that the placements are, in fact, outside the parameters of the I. C. P. C. as concededly *35 these placements have been to institutions which offer mental health counseling, service retarded children, and provided mental health services.
The defendants argue that the prohibition relates to placements in institutions where persons with severe mental illness and mental retardation are confined, or in those instances where the primary purpose of the placement is to provide inpatient mental health care facilities as would normally be provided by the New York State Department of Mental Hygiene.
The strict adherence to the letter of a statute will not be permitted to defeat the general purpose and manifest policy intended to be promoted, and a statute will not be construed to work an injustice or absurdity (Surace v Danna, 248 NY 18). As the court stated in Morgan v Hedstrom (164 NY 224, 230): "When the courts make an exception from the letter of the statute, because the subject excepted is not within its spirit and meaning, they do so to avoid a result so unreasonble or absurd as to force the conviction upon the mind that the excepted subject could not have been intended by the legislature”. (See, also, People ex rel. Manhattan Ry. Co. v Barker, 152 NY 417; New York Cent. & Hudson Riv. R. R. Co. v General Elec. Co., 167 App Div 726, revd on other grounds 219 NY 227, cert den 243 US 636.)
The Legislature did not and could not have contemplated the interpretation proposed by the plaintiffs. Such a reading of the statute would prohibit any adjunct or ancillary mental health services, in an age when it has become manifestly clear that these services are a necessary adjunct to foster care and the trauma associated therewith.[4]
*36 The court concludes that the fact that mental health services are provided in conjunction with a placement for foster care does not in itself remove these placements from within the scope of the I. C. P. C. Rather, the court must look to the primary purpose of the placement and the nature of the institution to determine whether or not the placement was proper under the terms of the compact. These are factual questions more properly the subject matter of the trial court (see Sillman v Twentieth Century-Fox Corp., 3 NY2d 395; Armstrong Rubber Co. v Autotransformation, Inc., 61 AD2d 1129; Moskowitz v Garlock, 23 AD2d 943).
Plaintiffs’ assertions concerning the institutions involved here and descriptive informational materials distributed by the institutions themselves[5] are not in and of themselves dispositive of this issue as a matter of law. Finally, also involved is a factual determination of whether the institutions in which the plaintiffs were placed provide counseling, therapy, education and diagnostic services as distinguished from mere custodial care.
DUE PROCESS
Plaintiffs’ request for injunctive relief is predicated, in part, on the grounds that out-of-State placement, pursuant to the Interstate Compact on the Placement of Children is violative of the equal protection clause of the New York State Constitution and the Fourteenth Amendment to the United States Constitution. Furthermore, the plaintiffs claim that out-of-State placements violate their rights to due process.
Essential to any determination as to whether or not there has been a violation of due process is a determination of whether or not the nature of the interest at stake comes within the Fourteenth Amendment’s protection of liberty and property. As the court stated in Board of Regents v Roth (408 US 564, 570-571): "[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight’ but to the nature of the interest at stake * * * We must look to see if the interest is within the Fourteenth Amendment’s protection of liberty and property.”
At the outset it should be noted that the "interest” in the *37 instant case is not the removal of the child, but where the child should be placed geographically, once there is a removal from the home.
The placement of the child in foster care does not terminate the parent-child relationship. Voluntary placement may provide for the return of the child to the natural parent at a specified date or upon occurrence of a particular event. In addition, and under section 384-a (subd 2, par [a]) of the Social Services Law, the parent may demand and the agency must return a child within 20 days. The natural parent’s placement of the child with the agency does not surrender legal guardianship and under certain circumstances parental consent is required (i.e., consent to surgery or marriage, legal representations, enlistment in the armed services). The parent has not only the right but the obligation to visit the child and plan for the future, indeed the failure to so participate can result in a court order terminating the parent’s rights on the grounds of neglect (Social Services Law, § 384-b, subds 4, 5, 7; Domestic Relations Law, § 111; Family Ct Act, § 611). Even in those instances where the child has entered foster care involuntarily, as adjudicated juvenile delinquent or as an abused or neglected child, the obligations detailed above, with few exceptions are equally applicable.
This court views the foregoing as evidence of the legislative recognition of the natural parent’s continued role, participation, privilege and obligation with respect to the child’s upbringing.
Although in some unusual situations, out-of-State placements may be geographically closer than in-State placements, it seems uncontradicted that the vast majority of placements are to institutions hundreds of miles from the family home. The court cannot ignore the fact that out-of-State placements effectively, in many if not most instances, preclude visitation by the natural parents.[6]
The Supreme Court, in Smith v Organization of Foster *38 Families (431 US 816, 842) stated: "It is, of course, true that 'freedom of personal choice in matters of * * * family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment.’ * * * There does exist a 'private realm of family life which the state cannot enter’ * * * that has been afforded both substantive and procedural protection.”
As the court stated in Prince v Massachusetts (321 US 158, 166): "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply or hinder.”
This principle, as previously noted, has been recognized and included in the Legislature’s enactments relative to foster placements.
It is also clear, to this court, that foster care does not terminate the parent-child relationship but presumes an active role on the part of the natural parent.
In light of this conclusion, and the practical effect of the separation of parent and child, this court reaches the inescapable conclusion that there is a legally recognizable interest to which the due process requirement of the Constitution attaches.
We come then to the consideration of whether or not the procedures involved here meet the requirements of due process. The Supreme Court, writing in Smith v Organization of Foster Families (431 US 816, 847-849, supra): "Where procedural due process must be afforded because a 'liberty’ or 'property’ interest is within the Fourteenth Amendment’s protection, there must be determined 'what process is due’ in the particular context. * * * '[identification of the specific dictates of due process generally required consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government’s interest, including the functions involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail’ ”.
The question therefore posed is what procedures, if any, are available with respect to out-of-State placements so as to protect the interest of the families herein? It would appear that there are no existing procedures which afford the plain *39 tiffs an opportunity to challenge out-of-State placements. Absent such a procedure, there is no way to determine whether the actions of the defendants are arbitrarily and capricious and violative of due process or equal protection. Moreover, if there were such a regularly employed procedure it would help insure against or minimize risks of erroneous deprivation of private interests affected by governmental actions (see Matthews v Eldridge, 424 US 319, 335).
Sections 392 and 358-a of the Social Services Law appear to be inapplicable to such determinations. It would appear that no safeguards are provided other than under CPLR article 78.
This is in sharp contrast with procedures for placements under the Mental Hygiene Law and the Education Law. Under section 4404 of the Education Law a parent may appeal a proposed out-of-State placement and that placement is stayed pending such appeal. The Interstate Compact on Mental Health (Mental Hygiene Law, §§ 9.09, 15.09) provides an opportunity for review and a notice to the patient’s advocate group to appeal such a placement.
Under the I. C. P. C. (art 6), a child who has been previously adjudicated a delinquent, may be placed out of State only after a court hearing, on notice to the parent or guardian, after a finding that the equivalent facilities for the child are not available in the State; that institutional care in the other jurisdiction is in the best interest of the child, and that such placement will not produce undue hardship.
The court rejects plaintiffs’ contention that a similar full judicial hearing must be afforded every child not a delinquent child, sought to be placed in an out-of-State institution. The underlying rationale governing the procedures for out-of-State placement of a delinquent child is that such placements are similar to probation or parole supervision. It may also be anticipated that the delinquent child can be sent to a training school or to a secure institution. This clearly is not anticipated for the plaintiffs or that class of children conceivably involved here. While plaintiffs may be subject to close supervision and in a sense deprived of freedom of movement, there is a clear distinction in the degree of such deprivation as between themselves and the delinquent child. Moreover, a hearing such as provided adjudicated juveniles would entail such fiscal and administrative difficulties as to seriously endanger the State’s endeavors in this area.
Accordingly, the defendants are directed to submit to the *40 court within 60 days of the filing of this decision a proposal for a review procedure whereby a parent or guardian may appeal or challenge an out-of-State placement made under the I. C. P. C.
RIGHT TO TREATMENT
Defendants’ motion to dismiss the complaint on the grounds that plaintiffs have not legally established the existence of a right to treatment is denied. Assuming the allegations of the complaint to be true, as we must, for the purposes of the motion to dismiss (Cohen v Lionel Corp., 21 NY2d 559) this court holds that there is a factual issue as to whether or not the plaintiffs are receiving the treatment to which they are entitled. A review of the controlling cases support the simple proposition that once a State assumes the burden of parens patriae and places or commits a child to some custodial setting, the State has an obligation to provide the necessary and proper care and treatment for the child (Matter of Lavette M., 35 NY2d 136, 142-143; Rouse v Cameron, 373 F2d 451; People ex rel. Hutchings v Smith, 50 AD2d 1097; Martarella v Kelley, 349 F Supp 575).
This is not to say, that the court can substitute its judgment for that of the social services professionals, as to what appropriate treatment and care is called for under any given circumstances (Matter of Lavette M., supra). However, all the court can and should do, when called upon as it is here, is make a factual finding as to whether or not necessary and proper treatment and care is provided.
DELEGATION OF AUTHORITY
The plaintiffs in paragraphs 79, 80, and 86 of their complaint allege that the defendant commissioners have unlawfully delegated their authority with respect to the class of children involved here. The charge is that once a child in need of placement has been rejected by New York child care agencies, the defendants automatically refer the child to the out-of-State institutions. The underlying thrust of plaintiffs’ argument is that if the child is not a problem child, a New York child care agency may accept him. If he or she is a problem child then the child is banished to an out-of-State institution. The plaintiffs thus claim that decisions relative to *41 placement under the I. C. P. C. have been delegated to the New York child care agencies.
The court is of the opinion that, if the allegations of the plaintiffs are true, then the defendants are in no better position to remedy the situation than are the plaintiffs. There is no statutory authority to compel New York child care agencies to accept a particular child. Nor is there any statutory authority to compel the placement in New York. The reality is such that a child rejected by a New York child care agency may have to be referred to an out-of-State institution or be denied placement.
The remedy lies with the Legislature. The Legislature may mandate the construction of new State facilities, and it may statutorily require private New York child care agencies to accept a certain percentage of "problem” children in proportion to its other children, as a condition of funding or certification.
Plaintiffs’ motion for summary judgment to enjoin further placements to out-of-State institutions on this ground is denied. The defendants’ motion to dismiss counts 79, 80, and 86 of the complaint is granted.
MOTION TO SUBSTITUTE AND DISMISS
We turn to the defendant Toia’s motion to substitute the present Commissioner of Social Services and to dismiss the cause of action individually as to himself, personally.
With respect to the substitution of the present Commissioner Barbara Blum, there is no opposition thereto and the motion is granted.
A more vexing problem arises out of the defendant Toia’s motion to dismiss as to him personally. At first blush, it would appear that the doctrines enunciated in Rottkamp v Young (21 AD2d 373) and Movable Homes v City of North Tonawanda (56 AD2d 718) mandate a dismissal of the complaint. However, I. C. P. C. (art 4, Penalty for Illegal Placement) provides that violation of the compact is punishable by the laws of both the sending State and the receiving State. At this juncture it is unclear whether the compact was violated, by whom and what violations of State law, if any, took place either in the sending State or the receiving State and what penalties are involved.
It should be noted that if the allegations in the complaint *42 are in fact proved and the "administrator” (commissioner) had knowledge of said violations, then it is conceivable that the commissioner might be subject to a penalty for illegal placements pursuant to article 4 of the I. C. P. C.
Accordingly, this branch of the motion is denied with leave to renew at a later stage of the proceedings.

. Since the commencement of these actions both have returned to New York State, are allegedly in need of care and treatment (they are under 21 years of age) and refuse to go out of the State to receive same. It is the court’s understanding that the absence of these plaintiffs from the out-of-State institutions, does not make moot the issue of whether their placement there was violative of sections 374-a and 398 (subd 6, par [g]) of the Social Services Law.

. The allegations contained in the complaint are to the effect that the plaintiffs are representatives of a group of children "banished” to residential institutions where they have been subject to harsh conditions, physical abuse and drugging.
What is disturbing to the court, is that there appears to be evidence to the effect that the institutions involved herein deal predominantly in disturbed children. It would also appear that these institutions which have been the subject of investigative reporting, and are alleged to be notorious in their maladministration, are under investigation by the State authorities. (See Barden, Human Welfare Groups Concerned Over Dispersal of Problem Children, The New York Times, Aug. 14, 1977, p 1; Kantor, Little Watched Homes for "Bad” Kids, Make Big Money, The Sunday News *32 [Detroit], July 24, 1977, p 1; Interstate Commerce of Kids, 60 Minutes CBS-TV, Oct. 17, 1976.)

. Creighton, The placement of New York State Children Out of State for Treatment, New York State Div. for Youth, Feb. 25, 1977.

. The draftsman’s notes to the I. C. P. C. in discussing subdivision (d) of article 2 state: "Since the compact is conceived as an instrument of handling the general environmental problems of upbringing, rather than specific and specified mental, medical and educational services, the definition of placement specifically excludes such activities. Of course, the need for such services can develop in or accompany any child rearing process and the compact does not prevent their being furnished. However, if such services are the primary purpose of the 'sending or bringing’ of the child, it is not a placement within the meaning of the compact. A few, highly specialized institutions for the care of problem children also pose problems of definition. They provide care of the general child rearing type, combined with educational programs and attention to mental or physical problems. They may defy simple description as 'homes’ 'hospitals’ or 'schools.’ Moreover the very individualized nature of the services which they provide make many of them unique. Consequently, every party state, in its administration of the compact, will have to make its own determinations in respect to the coverage of such institutions.”

. Montanari (Hialeah, Fla.) describes itself as a "psychiatric facility” and is accredited by the Joint Commission of Hospital. Edgemeade (Roanoke, Va.) describes itself in its brochure as a "system of residential psychiatric centers.”

. Over 50% of all children in foster care in New York City are from female-headed families receiving aid to families with dependent children (Foundation for Child Development, State of the Child; New York City, 61 [1976]). What opportunities do such parents have to visit children relocated as far away as Florida or Virginia? A recent study of parental contacts found that 51.4% of all foster children had little or no contacts with their natural parents for at least six months (Child Welfare Information Services, Parental Visiting Information, New York City Reports, Table 1 [Dec. 31, 1976]).