Fuchsberg, J.
(dissenting in part). I would hold that the out-of-State placement of foster children without any prior notice or hearing violates their constitutional rights to family integrity and beneficial nonarbitrary treatment.[1]
In thus meeting the critical due process issue presented in this case head-on, I, of course, do not believe its avoidance can be justified. This the majority seeks to accomplish by a general statement that factual issues need to be resolved. Such an inquiry apparently would focus on the development of facts from which it could be determined whether *437 sections 374-a and 398 (subd 6, par [g]) of the Social Services Law have been violated. However, since it is undisputed that each of the cases here involved an out-of-State placement in connection with which no prior hearing was afforded to either the children or the parents[2] and the statutes facially require no such hearing or notice, whether they were violated is irrelevant to a consideration of the constitutional question. Still to be decided would be whether the statutes, even if strictly adhered to, met the mandates of due process.[3] The detour on which the majority now launches would, therefore, not be dispositive, for it would lead to a dead end at whose terminus no decisive constitutional ground is to be found (cf. Matter of Peters v New York City Housing Auth., 307 NY 519, 528 [Fuld, J.]) ,[4]
In any event, the constitutional issues should not be foreclosed since these have been “fairly presented to us, and public interests require that [they] should be determined” (People ex rel. Unger v Kennedy, 207 NY 533, 541).[5] It hardly needs reiteration here that New York State, the site of the Nation’s greatest confluence of social problems *438 of the kind we meet in this case, has traditionally shown a deep concern for the fair legal treatment of their subjects. The public interest is apparent.
Turning then to due process, initially I observe that it is now well established that the proper analytical approach to an issue that falls within that basic constitutional concept is to look first at the nature of the interest at stake to see if it is within the protection of liberty and property (US Const, 14th Amdt; NY Const, art I, § 6; Board of Regents v Roth, 408 US 564, 570-571). Only after it is found that some procedural due process must be afforded are the “protections * * * the particular situation demands” to be ascertained (Morrissey v Brewer, 408 US 471, 481; see Mathews v Eldridge, 424 US 319, 335).
Relevant to the context in which we must apply this analytical course is the nature of foster care in New York. It has been defined authoritatively as “ ‘[a] child welfare service which provides substitute family care for a planned period for a child when his own family cannot care for him for a temporary or extended period, and when adoption is neither desirable nor possible’ ” (Smith v Organization of Foster Families [hereafter Smith v OFFER], 431 US 816, 823, citing Child Welfare League of America, Standards for Foster Family Care Service 5 [1959]). Under the New York statutory scheme, children may enter into foster care by voluntary commitment (Social Services Law, § 384-a) or by court order in neglect or abuse proceedings (Family Ct Act, generally art 10; see, especially, §§ 1052, 1055). Two of the children here, Jeannette Morgan and John Evans, entered voluntarily.
The consequences of voluntary placement do not include the formal termination of the parent-child relationship. While the law transfers “care and custody” to the agency (Social Services Law, § 384-a), the natural parent (or guardian) does not surrender legal guardianship. Indeed, the written instrument by which voluntary placement is arranged must, by statute, fix parental visitation privileges, which may not be changed subsequently except by written mutual consent or by court order (Social Services Law, § 384-a, subd 2, pa,r [b]). Moreover, so highly regarded is the continuance of the relationship that, if the right to *439 visit is neglected, termination of parental rights may ensue (see Social Services Law, § 384-a, subd 2, par [c], cl [iv]; § 384-b, subds 4, 5, 7; Domestic Relations Law, § 111; Family Ct Act, § 611). The practical policy behind such provisions is to maintain and to “strengthen” the ties between the child and his or her parents (see Social Services Law, 384-b, subd 7, par [a]). The nature of the continuing parental role may also be seen in that the parent, absent termination, retains the right to have the child returned (Social Services Law, § 384-a, subd 2).[6]
This background in mind, I address the issue of whether there are “liberty” interests which require that the children be accorded procedural protection before being sent out of State for institutional care. Since only the children are plaintiffs in this case, the rights which must be protected are their own, not their parents. As indicated, I would find that in this case there are two: family integrity and beneficial nonarbitrary treatment, a right which in turn is allied to concepts of personal autonomy. Family integrity provides a protectible interest for the two children, Jeannette Morgan and John Evans, who have families. Beneficial nonarbitrary treatment provides a protectible interest not only for these two, but also for Carlos Sinhogar, who has no parents.
At least on the Federal level, this half century has witnessed a progression of decisional law establishing a fundamental right to family integrity. Since its evolution as a due process liberty interest began with the rights to be accorded parents vis-a-vis their children, our discussion also starts from that point. In the seminal case of Meyer v Nebraska, the court held unconstitutional a State law prohibiting the teaching of a foreign language to a child who had not yet successfully completed the eighth grade because it deprived parents of their Fourteenth Amendment liberty to “establish a home and bring up children” (262 US 390, 399). (See, also, Pierce v Society of Sisters, 268 US 510, 534-535; Prince v Massachusetts, 321 US 158, 166.)
*440 To the same effect, more recently the court, in Wisconsin v Yoder (406 US 205), went so far as to uphold the right of Amish parents to refuse to send their children to school beyond the eighth grade on the ground that the parental exercise of freedom of religion was superior even to the State’s interest, as parens patriae, in promoting education.[7]
An offshoot of these adjudications, whose common nexus is the parental interest in how their children are raised, are others which focus on the right of a parent to custody. In these, the family unit is of paramount concern. So, in May v Anderson (345 US 528) and Armstrong v Manzo (380 US 545), the court established that before parents’ rights to the care, custody, and companionship of children, “ [r] ights far more precious * * * than property rights”, could be cut off, a court must have in personam jurisdiction over the parent (May v Anderson, supra, p 533). In Armstrong, the court was short and pointed: “[A]s to the basic requirement of notice itself there can be no doubt, where, as here, the result of the judicial proceeding was permanently to deprive a legitimate parent of all that parenthood implies” (Armstrong v Manzo, supra, p 550).
Although May and Armstrong were written in terms of the rights of a parent to his or her children, their broader implications became evident in Stanley v Illinois (405 US 645) and Moore v East Cleveland (431 US 494), where the court implicitly recognized that the interest at stake is a relational one, that is one which takes in the relationship between parent and child and belongs to both.
In Stanley, at issue was an Illinois law which provided that, upon the death of the mother, the children of unwed fathers become wards of the State. As relevant here, the court concluded that due process required individualized hearings to determine whether particular fathers were unfit before they could be separated from the children. In so deciding, the court noted that it had “frequently emphasized the importance of the family” (Stanley v Illinois, supra, p 651) and stated that the “integrity of the family unit *441 has found protection in the Due Process Clause of the Fourteenth Amendment, Meyer v. Nebraska, supra, at 399” (id.).[8] The citation to Meyer for the family integrity proposition, of course, is not a precise application of that case. It is, however, representative of the manner in which the court had begun to meld its cases dealing with family and to express the protection accorded to that relationship rather than in terms of the parents alone.
In Moore, the court dealt with the fundamental right of family members to live together. It struck down a Cleveland ordinance which defined “family” in such a way that appellant’s “extended family” (a mother, son and two grandsons, who were cousins) could not legally occupy a single dwelling unit. While recognizing that in some circumstances a State may intrude on choices concerning family living arrangements, the court held this ordinance could not survive constitutional scrutiny.
It is of note that, in addition to the Supreme Court finding a right to “family integrity” in the Fourteenth Amendment’s right to “liberty”, the court has also begun to rely on the fundamental right to privacy, which too is rooted, at least in part, in the Fourteenth Amendment, as the basis for justifying numerous decisions relating to the family (e.g., Griswold v Connecticut, 381 US 479 [permitting the distribution of information on contraception]; Loving v Virginia, 388 US 1 [upholding a racially mixed couple’s fundamental right to marry] ; Zablocki v Redhail, 434 US 374 [overturning a requirement of a court order to permit the marriage of one under a duty to support minor children not in that parent’s custody]).
Interestingly, the right to privacy has, in a sense, been given retroactive effect. Specially, even though this right had not yet been officially identified by the Supreme Court when the Meyer, Pierce, and Prince cases were decided, the rights they vindicated have since been included within the toll of interests so protected (see Carey v Population Servs. Int., 431 US 678, 684-685).
Thus, the United States Supreme Court has repeatedly *442 pronounced that natural families have a fundamental right to be together. Since a child is an integral member of the family, these decisions necessarily protect his or her family-related rights. Surely, included is a right to be in the care and custody of the family (Prince), to have the parents’ companionship (May), and to at least be given notice before being deprived “of all that [family] implies” (Armstrong ).
The decision to send a child hundreds or thousands of miles from parents and siblings necessarily affects in a profound way these fundamental rights of a child to an ongoing family relationship. Out-of-State placements inevitably and severely burden the attempts of the families involved to maintain their relationships. Visiting is more difficult; phone calls are more expensive; contact is more sporadic; emotional ties become more strained. Both physically and psychologically, the family is stretched to its limits and beyond.
Smith v OFFER (431 US 816, supra) and Parham v J. R. (442 US 584), two recent Supreme Court cases cited in the majority’s opinion, are not to the contrary.'
In Smith, the plaintiffs were individual foster parents and an organization of foster parents. The substance of the complaint was that the New York statutory procedures governing the removal of foster children from foster homes violated the due process and equal protection clauses of the Fourteenth Amendment. The plaintiffs’ claim was that, once a child had lived in a foster home for a year or more, the psychological ties between the child and the foster parents create a true “psychological family”, which has a “liberty interest” in its survival. Although the court refused to “dismiss the foster family as a mere collection of unrelated individuals”, it found only “the most limited constitutional ‘liberty’ in the foster family” (Smith v OFFER, supra, p 844-845, 846 [emphasis added].) Moreover, it did not forget that this “liberty” could be in “tension” with the constitutional protection accorded the natural family, a “liberty interest that derives from blood relationship, state-law sanction, and basic human right” (Smith v OFFER, supra, p 846). The “tension” would come from the fact that the natural parents, under New York *443 law, retain the absolute right to the return of the child in the absence of a court order. To read this case, which, while severely limiting the rights of foster parents, is a veritable ode to natural families, as suggesting that there is no “liberty” interest for these children is to misapprehend its import.
In Parham, one issue was what process was constitutionally due a minor child whose parents seek State administered institutional mental health care for the child. For the purposes of that decision, the court assumed “that a child has a protectible interest, not only in being free of unnecessary bodily restraints but also in not being labeled erroneously by some persons because of an improper decision by the state hospital superintendent” (Parham v J. R., supra, p 601). Such an assumption simply is not in conflict with a holding that a child has a liberty interest in family integrity.[9]
Now, all this leaves little room, if any, to doubt that the Federal Constitution, as interpreted by the United States Supreme Court, manifestly supports a holding that children have a constitutional right to family integrity. However, even if that Constitution did not extend so.far, the public policy of this State, expressed in implementing statutory and decisional law, but, most emphatically, in our State Constitution’s repeated concern for the sociallv deprived (e.g., NY Const, art XVII, §§ 1, 3, 4; art XVIII, § 1; see Matter of Levy, 38 NY2d 653, 658-659) , makes it almost inconceivable that the due process provision of the New York Constitution (art I, § 6) not afford the children the higher protections that would then be necessary. In such circumstances, States are free to provide greater rights for their citizens through their own Constitutions (Cooper v Morin, 49 NY2d 69, 79; Sharrock v Dell Buick-Cadillac, 45 NY2d 152, 159-161; People v Isaacson, 44 NY2d 511, 519-520; People v Hobson, 39 NY2d 479, 483-484; People v Arthur, 22 NY2d 325, 328-329; see, generally, Howard, State Courts and Constitutional Rights in the Day of the Burger Court, 62 Va L Rev 873, 891-907).
*444 In so concluding, we are not swayed, as is the majority, by the statistically averaged protection provided by our sister States, whose own Constitutions no doubt were responsive to the peculiar social, demographic and political climates in which each was produced. Certainly, our guide need not be the least common denominator. And, that our standards are not newly elevated today appears from our unanimous declaration that “[n]o court can, for any but the gravest reasons, transfer a child from its natural parent to any other person * * * since the right of a parent, under natural law, to establish a home and bring up children is a fundamental one and beyond the reach of any court” (People ex rel. Portnoy v Strasser, 303 NY 539, 542 [Desmond, J.] ; see Matter of Jewish Child Care Assn. of N. Y. [Sanders], 5 NY2d 222, 229; Matter of Spence-Chapin Adoption Serv. v Polk (29 NY2d 196, 203; cf. Weiss v Weiss 52 NY2d 170, 174-175).
All this said, it still becomes necessary to treat with the Carlos Sinhogar case separately. He has no family, and so, no constitutional interest in maintaining family integrity as such. Nonetheless, along with the other children, he shares a right to be protected against the power of the State in this context. For children have a right to personal autonomy — a privacy right having its roots in the First, Fourth and Fifth Amendments, the penumbra of the Bill of Rights, the Ninth Amendment and in the concept of liberty guaranteed by the Fourteenth Amendment (see Planned Parenthood of Mo. v Danforth, 428 US 52, 60 [parental consent requirement to a minor’s legal abortion struck down]; Roe v Wade, 410 US 113, 152).
That right, however, necessarily is circumscribed by the State’s assumption of the care and custody of the children. But the State’s custodial obligation does not give it unlimited sway over the children’s destinies. The State’s responsibility in these circumstances is to act in their best interests and not arbitrarily. A child, whether a parentless ward of the State, as is Carlos, or one whose custody has been transferred to the State, therefore, may expect beneficial and nonarbitrary treatment at its hands. A due process right, under our Federal and State Constitutions, exists to protect those expectations. The right encompasses the children’s in *445 terests in being free from bodily restraint and from being shipped across the country with no more protection against arbitrary treatment than if they were apples or oranges.
As we have now determined that all of the children have a constitutional liberty interest at stake, I proceed to the final step of our analysis — the evaluation of available procedural safeguards and determination of whether they vindicate the rights of the children. At this juncture, however, fair heed should be given to the fact that a family’s integrity is to some extent compromised by the voluntary placement of a child into foster care. The State becomes an additional party to the relationship — a party which is sought out to aid the family. In this setting, it cannot be persuasively argued that the child should be accorded the full panoply of procedural protections. In fact, plaintiffs do not contend that the decision to place a child who has already been removed from his or her home to an out-of-State facility is of equal constitutional significance with an initial decision to remove the child (i.e., a nonvoluntary placement into foster care) or a decision to terminate forever the parent-child relationship. Rather, the plaintiffs assert that even a qualified relationship with their parents is entitled to some constitutional protections.
But the New York statutory scheme provides none. As to the miscellaneous New York statutes to which the majority alludes, in main solely by reference to the Appellate Division’s disposition, on analysis, taking them one by one, they turn out to furnish no protection to the children.
Section 400 of the Social Services Law, providing neither notice nor a hearing prior to the out-of-State placement, is a postremoval remedy in the form of an administrative fair hearing (see People ex rel. Ninesling v Nassau County Dept, of Social Servs., 46 NY2d 382, 386). While it may be an effective appellate vehicle for foster parents who unsuccessfully contested, in a preremoval conference, a new placement of their foster child (cf. Smith v OFFER, 431 US 816, 830, 853, supra), it cannot be used to thwart or even to discuss the merits of an impending out-of-State placement. Article 78 review of a section 400 hearing could, therefore, be of no benefit to the children.
*446 Despite the majority’s protestations to the contrary, a proceeding initially commenced under article 78 is also inadequate. The “arbitrary and capricious” standard (CPLR 7803), although proper to review an administrative fair hearing, is inapposite in an instance in which a decision concerning a child’s fundamental rights is being examined de novo after the decision has been implemented.
Section 392 of the Social Services Law, requiring periodic review of a child’s placement in foster care, is ineffective in that the scheduling of its hearing bears no relationship to the decision to send a child out of State, and the limited statutory dispositional alternatives do not permit a review of the judgment to send a child out of State.
With regard to section 384-a of the Social Services Law, which sets out the terms of a parent’s voluntary placement of a child into foster care, its only possible relevance is that a parent could invoke its terms to have the child returned to the parent’s custody. As it provides, however, no review of the decision to place a child out of State, if the parent cannot resume custody of the child, it is of absolutely no use.
Section 358-a of the Social Services Law, primarily intended as a funding device to trigger the flow of Federal dollars (see NY Legis Ann, 1973, p 201), is also unsatisfactory since the issue at a hearing under it is the voluntariness of a parent’s transfer of custody, not whether a placement by the State is in the child’s best interests.
Finally, while various provisions of the Family Court Act (§§ 249, 741, 742, 1041, 1042, 1112) may satisfy due process with regard to how the State initially intervenes in the parent-child relationship and how the State deprives a juvenile of his or her liberty in the first instance, they have nothing to do with the availability of a regular review procedure to challenge a decision to send a child to an out-of-State institution.
Now, as to the New York edition of the Interstate Compact on the. Placement of Children (Social Services Law, § 374-a), that is also valueless as a form of procedural protection. Under that statute, the sending agency must provide the appropriate public authorities in the receiving State with the child’s name, date and place of birth, the *447 names and addresses of the child’s parent or guardian, the name and address of the agency or institution to which the sending agency proposes to place the child and a statement of the reasons for the proposed action. While the authorities in the receiving State may request additional information, their only obligation is to notify the sending State that the “proposed placement does not appear to be contrary to the interests of the child” (Social Services Law, § 374-a, art III [emphasis added]). This is all that is required. There is no notice to the child nor to the parents that the process is taking place, and there is no opportunity for the placement decision to be questioned.[10]
It follows that, contrary to the Appellate Division’s determination that the scant language and requirements of the compact constitute an independent individual review of each child’s placement and, therefore, comport with the requirements of Parham, its procedures do not meet even the minimal standards.
Specifically, in Parham, in order to decide what process was required to meet the child’s “assumed” constitutional interest, the court relied heavily on the presumption that parents are more mature and better able to make difficult decisions. Of even greater importance, however, was the fact that “historically it has been recognized that natural bonds of affection lead parents to act in the best interests of their children” (442 US 584, 602). Despite this deference to parental decisions, the court concluded that the risk of error was sufficiently great that there must be a “neutral factfinder” (id., p 606). A staff physician, who independently freely evaluated the child’s mental and emotional condition and the need for treatment, was found to suffice.
Although the court did not explicitly detail the components of the evaluation, the type it envisioned can be seen in the procedures it sanctioned. There was a private examination and interview of each child, a review of the child’s relevant medical records and an interview with the parents. Then, “the admissions team [made] a diagnosis and [de *448 termined] whether the child [would] likely benefit from institutionalized care” (Parham v J. R., supra, pp 614-615 [emphasis added]). If the condition was not met, then admission would be refused. A formal or quasi-formal hearing was not considered necessary and, indeed, was thought to pose a danger of a “significant intrusion into the parent-child relationship” as it would pit the parents and child against each other and “be at odds with the presumption that parents act in the best interests of their child” (id., at p 610). While this evaluation process is not all that might be desired, it is significantly greater than that required under the compact.[11]
Moreover, it is to be observed that Parham, at best, applies only to Carlos, not to the children who have parents. In this connection, it should be remembered that the constitutional “liberty” sought to be protected in the two cases is not the same. The difference in the type of interest to be protected affects the manner of protection. In Parham, the parent and the child were in adversary positions with the child seeking to contest the parental decision of confinement in a mental institution, the State thus being allied with the parents. In the court’s “mind”, only minimal process was needed because of the presumption that parents act in the best interests of their child. On the other hand, the interests of the parents and their children here are not in conflict. Their interest is a common one: the maintenance of the family as an integral unit. Consequently, according children procedural protections, before their being placed out of State, would offend no principle set out in Parham. Instead, it would be to recognize a basic liberty and to safeguard it.
For all these reasons, I would not only modify the order of the Appellate Division as has the majority, but, addi *449 tionally, I would modify it so as to require the defendants to grant a hearing to each of the plaintiffs on appropriate notice in accordance with this opinion.
Judges Jasen, Gabrielli and Wachtler concur with Judge Jones ; Judge Fuchsberg dissents in part and votes to modify in a separate opinion in which Chief Judge Cooke and Judge Meyer concur.
Order modified, without costs, in accordance with the opinion herein and, as so modified, affirmed. Question certified answered in the negative.

. Although the majority opinion phrases the issue in terms of “emotionally disturbed and mentally retarded children”, it is the rights of foster children placed in out-of-State institutions which are at stake.

. The out-of-State placement in Vermont of the third named plaintiff, John Evans, a retarded 16 year old, who appears in this action by his parents, had not been effected at the time the action was initiated. Subsequent to the commencement of this proceeding, however, his parents accepted a placement for him in southern New Jersey, pursuant to a stipulation with defendants which expressly reserved John Evans’ claims in this action.

. Each of these sections authorizes the State’s public welfare officials to place children in foster care in out-of-State institutions. Section 374-a of the Social Services Law is New York’s enactment of the Interstate Compact on the Placement of Children.

. It is not surprising, therefore, that, notwithstanding the majority’s unreadiness to do so now, both courts below passed directly on the constitutional issue. Special Term reached what it terms “the inescapable conclusion that there is a legally recognizable interest” in the family, but held that the New York procedures did not protect it (Sinhogar v Parry, 98 Misc 2d 28, 38). It thereupon granted partial summary judgment to the plaintiffs on this due process issue and ordered the defendants to prepare a proposed review procedure. The Appellate Division also recognized “the substantive and procedural protection to which the integrity of family life is entitled” (Sinhogar v Parry, 74 AD2d 204, 210). It disagreed, however, with Special Term on the adequacy of the safeguards New York provides. In short, though they differed as to whether the protections were sufficient, both courts, as we do now, met the issue.

. I shall not here analyze plaintiffs’ contention that they are entitled to certain State-created benefits since that equal protection claim is not properly before us, Special Term having failed to resolve it and no appeal being taken on this ground.

. For an informative discussion of foster care in New York, see Note, The Fundamental Right to Family Integrity and Its Role in New York Foster Care Adjudication (44 Brooklyn L Rev 63, 75-87).

. Yoder, however, has been criticized by commentators for concentrating on the rights of parents, rather than of parents and children both (see, e.g., Richards, The Individual, the Family and the Constitution: A Jurisprudential Perspective, 55 NYU L Rev 1, 42-43).

. Family integrity was also protected, according to the court, by the equal protection clause and the Ninth Amendment (Stanley v Illinois, 405 US 645, 651).

. Parham also raised the problem of bodily restraint with respect to a “ward” of the State. How that affects the plaintiff Carlos Sinhogar because he is parentless is discussed separately at pages 444-445 of this opinion.

. The compact does not prohibit an enacting State from adopting supplemental legislation granting procedural protections to its children before deciding to send them out of the State. But our Legislature has adopted none.

. The Supreme Court’s failure to adequately safeguard the children’s interests has been roundly criticized (see Richards, The Individual, the Family, and the Constitution: A Jurisprudential Perspective, 55 NYU L Rev 1, 57-61; Supreme Court, 1978 Term, 93 Harv L Rev 62, 89-99; Mabbutt, Juveniles, Mental Hospital Commitment and Civil Rights: Case of Parham v J. B., 19 Journal of Family L 27; Comment, Postadmission Due Process for Mentally Ill and Mentally Retarded Children after Parham v J. B., and Secretary of Public Welfare v Institutionalized Juveniles, 29 Catholic Univ L Rev 129).