CARLOS SINHOGAR, by His Guardian ad Litem KENNETH CLARK, et al., on Their Own Behalf, and on Behalf of All Others Similarly Situated, Respondents, v CAROL PARRY, Individually and as Assistant Administrator of Special Services for Children, et al., Appellants.

First Department, April 17, 1980

### APPEARANCES OF COUNSEL

*Robert J. Schack* of counsel *(George D. Zuckerman* with him on the briefs; *Robert Abrams, Attorney-General,* attorney), for Barbara B. Blum and others, appellants.

*Marjorie E. Bornes* of counsel *(Ronald E. Sternberg* with her on the brief; *Allen G. Schwartz, Corporation Counsel,* for Carol Parry and others, appellants.

*Marcia Robinson Lowry* of counsel *(George Kannar* and *Mary H. Sandoval* with her on the brief), for respondents.

### OPINION OF THE COURT

SULLIVAN, J.

At issue is the legality of the placement of New York City

foster-care children in out-of-State residential facilities. Seeking class action certification to represent the more than 300 others who, they claim, are similarly situated, plaintiffs, three children placed with the New York City Department of Social Services, sue the Commissioners of the City and State Departments of Social Services in both their individual and representative capacities for declaratory and injunctive relief, as well as damages. They allege that, without the opportunity for prior review, their placement in distant out-of-State institutions at which they not only did not receive proper treatment, but at which they were also subjected to physical abuse and drugging, violated their right to due process of law and their statutory and constitutional right to care and treatment.

Plaintiffs allege that in 1972 City Social Services,[1] faced with a consent judgment entered in a Federal lawsuit requiring it, *inter alia,* to secure suitable placement for those children in its care being discharged from mental hospitals,[2] and unable to find suitable in-State accommodations for the placement of emotionally disturbed children in foster care, began a large-scale shipment of children to out-of-State residential institutions. It is alleged that plaintiffs and other children were placed out of State with the approval, support and funding of State Social Services in institutions where standards are uncertain and unsupervised, and whose fiscal operation is questionable; that many of these children are denied adequate treatment and care; that they are often separated from their families and communities for years; and that the conditions of their confinement are such as to endanger their physical, emotional and psychological health and well-being. Special Term's denial of class action certification has gone unappealed. Thus, only the claims of the three plaintiffs are in issue.

Plaintiff Carlos Sinhogar is an emotionally disturbed 17-year-old child who, at the age of 13 months, was placed following a Family Court adjudication of neglect. His parents are now dead. Before the commencement of this action, he had been placed with a child care program in Virginia, known as Edgemeade, which offered mental health services. The other two plaintiffs, Jeanette Morgan and John Evans, are

---

1. Acting through Special Services for Children, an agency within City Social Services. The Assistant Administrator of this agency is also named as a defendant.

2. *Eileen H. v Beine,* 71 Civ 3576 [SDNY].

voluntary placements.[3] At the time of the commencement of this action Jeanette, an emotionally disturbed 17-year-old child, had been placed with a child care program in Florida, known as Montanari, which also offered mental health services. John, 16 years old, is mentally retarded. His parents had sought an appropriate local placement for him. They were offered placements in Vermont or New Jersey and, with their consent, he was placed during the pendency of this proceeding in the American Institute for Living in New Jersey. Such placement was made without prejudice to the claims asserted herein.[4]

Plaintiffs moved for partial summary judgment declaring that the out-of-State placement of Carlos and Jeanette[5] in institutions not approved by the New York State Board of Social Welfare, and which care for the mentally ill or retarded, violated sections 374-a and 398 (subd 6, par [g]) of the Social Services Law. The State Social Services Commissioner cross-moved to dismiss pursuant to CPLR 3211 (subd [a], par 7) on the ground that the complaint failed to state a cause of action against him in either his representative or individual capacity. Special Term granted partial summary judgment, finding New York State's statutory scheme for the out-of-State placement of foster-care children violative of due process, and also denied the cross motion to dismiss.

In determining that due process had been violated, Special Term emphasized that the interest protected by the Fourteenth Amendment was not the removal of the child from the home but, rather, the geographic location of the foster-care placement after removal. It concluded that out-of-State placements effectively preclude visitation by the natural parents and that New York's existing procedures failed to afford an opportunity to challenge such placements. The court directed defendants to submit a proposal for a review procedure whereby a parent or guardian might appeal or challenge a contemplated out-of-State placement.

3. All three plaintiffs appear in this action by a guardian ad litem. Carlos Sinhogar and Jeanette Morgan are pseudonyms.

4. After the commencement of this action, both Carlos and Jeanette returned to New York. Carlos has since been in a number of temporary child welfare programs, a hospital and a long term child welfare program. Jeanette enrolled in a vocational training program and is being discharged from foster care to independent living. The issue of whether their out-of-State placement violated, as they claim, their statutory and constitutional rights is not academic, however.

5. John Evans had not been placed out-of-State at the time the motion was made. The complaint has not been amended to reflect his out-of-State placement.

In denying the cross motion Special Term reserved for trial the issue of whether plaintiffs were receiving necessary and proper treatment and care. But, in so concluding, the court, citing, *inter alia, Matter of Lavette M.* (35 NY2d 136, 142-143), held that once the State assumes the burden of *parens patriae* and commits a child to a custodial setting, it has an obligation to provide the necessary and proper care and treatment for the child. Implicit in such a holding, we believe, is the view, urged by plaintiffs at Special Term and on appeal, that they are entitled to an individualized treatment program appropriate to their needs.

■■ We find that New York's statutory provisions for the placement of foster-care children in out-of-State facilities do not violate due process. We further find that on the issue of treatment, the question for resolution at trial should be whether the treatment received by plaintiffs in out-of-State facilities complied with New York's statutory standard of care, not whether they received treatment appropriate to their individualized needs.

■ At the outset we take note of the argument that the placement of Carlos and Jeanette in out-of-State facilities violated New York's statutory provisions for the placement of foster-care children. It is undisputed that neither Edgemeade nor Montanari, to which those plaintiffs were sent, is an authorized agency, as defined by subdivision 10 of section 371 of the Social Services Law. Section 398 (subd 6, par [g]) of the Social Services Law prohibits commissioners of public welfare and city public welfare officers from placing children in out-of-State institutions except for those institutions "located in an adjoining state as are maintained by a corporation organized under the laws of this state and having authority to maintain an institution for the care of children." Moreover, all placements, in-State or out-of-State, must be made in institutions visited, inspected and supervised by the New York State Board of Social Welfare. (Social Services Law, § 398, subd 6, par [g].) Neither Edgemeade nor Montanari is inspected or supervised by the State board.

With the enactment in 1960 of the Interstate Compact on the Placement of Children [ICPC] (Social Services Law, § 374-a), however, specific exemption from the probition of section 398 (subd 6, par [g]) of the Social Services Law was provided for out-of-State placements in conformity with ICPC provi-

sions:[6] "Neither the prohibition of, nor the limitations on out-of-state placement of children contained in sections three hundred seventy-four and three hundred and ninety-eight of this chapter shall apply to placements made pursuant to the interstate compact on the placement of children." (Social Services Law, § 374-a, subd 8.)

ICPC, whose primary purpose is the protection of children involved in interstate placements, was intended to facilitate interstate placement when such placement is found to be socially desirable and to enhance the opportunities for selecting suitable homes for children through easier accessibility to wider geographic areas.[7] Article IV of ICPC provides that the sending or receiving of a child in violation of the compact's terms is punishable or subject to penalty in either the sending or receiving State.[8]

It is conceded that due to administrative difficulties Carlos' and Jeanette's out-of-State placements were not in technical compliance with all of ICPC's terms. Whether such noncompliance gives rise to any liability is a matter for trial, along with the issue of State Social Services' involvement and participation in the noncompliance with ICPC's provisions.

The initial request to place a child out-of-State is submitted to State Social Services, which may not approve the transfer until the proposed placement facility or home agrees to take the child and the receiving State consents, after an independent study of the proposed placement. ICPC article III (par [b], cl [4]) requires the sending agency to furnish the appropriate public authorities in the receiving State with, *inter alia,* a full statement of the reasons for the placement. Furthermore,

6. Plaintiffs' claim that their out-of-State placements were not within the limited exception provided by ICPC because, in violation of paragraph (d) of article II thereof, they were sent to institutions which care for the mentally ill or defective was held by Special Term to raise factual questions for resolution at trial, a conclusion with which we agree.

7. Walter Hagen, The Interstate Compact on the Placement of Children, Child Welfare (Dec., 1960) pp 12, 14.

8. "The sending, bringing, or causing to be sent or brought into any receiving state of a child in violation of the terms of this compact shall constitute a violation of the laws respecting the placement of children of both the state in which the sending agency is located or from which it sends or brings the child and of the receiving state. Such violation may be punished or subjected to penalty in either jurisdiction in accordance with its laws. In addition to liability for any such punishment or penalty, any such violation shall constitute full and sufficient grounds for the suspension or revocation of any license, permit, or other legal authorization held by the sending agency which empowers or allows it to place, or care for children."

paragraph (d) of article III expressly provides that "[t]he child shall not be sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child." Thus, an individual evaluation of the child is required before any out-of-State placement may be authorized. Unlike delinquents, however, nondelinquents have no statutory right to a prior hearing under ICPC. Obviously, while the activities of the foster-care child with an emotional problem may be subject to monitoring, and, in a sense, the freedom of movement of such a child is curtailed, he is not deprived of his liberty to the extent the delinquent child is. It is now well established that a juvenile accused of committing a crime is entitled to the essentials of due process and fair treatment. (See *Matter of Gault,* 387 US 1; *Matter of Winship,* 397 US 358; *McKeiver v Pennsylvania,* 403 US 528.)

The principle of parental primacy in the raising of children was recognized by the United State Supreme Court in *Prince v Massachusetts* (321 US 158, 166): "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." The right of a parent to guide his or her child's upbringing has been characterized as the essence of personal liberty. *(Pierce v Society of Sisters,* 268 US 510, 534-535; *Meyer v Nebraska,* 262 US 390, 399-401.) It follows, of course, that "freedom of personal choice in matters of * * * family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *(Cleveland Bd. of Educ. v LaFleur,* 414 US 632, 639-640.)

In recognition of the substantive and procedural protection to which the integrity of family life is entitled, New York has enacted a number of provisions which, in our view, satisfy due process requirements. The initial foster-care placement is judicially reviewed. If placement is involuntary, whether pursuant to article 7 of the Family Court Act (delinquents and persons in need of supervision [PINS]) or article 10 (neglected or abused children), it follows an adversary hearing in which the parent may participate. (Family Ct Act, §§ 741, 1041.) The child is provided independent legal counsel. (Family Ct Act, §§ 249, 741.) There is a right of appeal. (Family Ct Act,

§ 1112.) On the other hand, while voluntary placements are not initiated by a judicial proceeding, a court review to determine whether removal from the parental home would be in the child's best interest is mandated if the child is likely to remain in care for a period in excess of 30 days. (Social Services Law, § 358-a, subd [1].) Unless waived, the parent is entitled to notice and to participation in such hearing. (Social Services Law, § 358-a, subds [4], [5].) An order granting or denying a parent's petition for return of the child is appealable. (Social Services Law, § 358-a, subd [8].) Thus, these proceedings, which may reach both the question of removal and the type of disposition required, provide an opportunity for immediate review if the decision to place out-of-State is made at the initial placement.

Once a child is in foster-care placement statutory provision is available whereby a parent or guardian may challenge removal from an in-State placement and transfer to an out-of-State facility. A decision to remove the child from an institution or family home is reviewable at the request of "[a]ny person aggrieved by such decision" by State Social Services at an administrative fair hearing. (Social Services Law, § 400.) The fair hearing determination is, in turn, subject to article 78 review. Pending determination of the judicial proceeding injunctive relief is also available to stay a proposed out-of-State placement. (See, e.g., *Goldberg v Sanders,* NYLJ, March 31, 1978, p 6, col 1.)

Furthermore, provision is also made for periodic Family Court review of the status of children in voluntary placement who have remained in foster care for a continuous period of 18 months. (Social Services Law, § 392, subd 2.) The parent or guardian is entitled to participate in such a proceeding (Social Services Law, § 392, subd 4, par [d]), and both the child and parent may appeal the court's determination (Family Ct Act, § 1112). Moreover, in such placements the parent has the right to the return of the child on request without court order. Should the agency refuse the request, the parent or guardian may seek return of the child by petition in Family Court or by writ of habeas corpus in the Supreme Court. (Social Services Law, § 384-a, subd 2, par [a].) Thus, the decision to place a child in an out-of-State facility is reviewable whether such decision is made at the initial placement in foster care, during placement or at the time an extension of placement is sought.

On two occasions in the past three years, the United States

Supreme Court has confronted the question of the due process right of children. In *Parham v J. R.* (442 US 584) the court found that a prior judicial or administrative fact-finding hearing was unnecessary for a child's admission to a mental health facility where the request for admission, whether by the parents or the State, was reviewed by a neutral, independent physician. *(Id,* at pp 607-610.) The court further noted that habeas corpus was available in any case where the hospital administrators might not be neutral. *(Id,* at p 616 and n 22).

In *Smith v Organization of Foster Families* (431 US 816, 853), the court, finding New York's procedures constitutionally adequate, and even overlapping, held that the State need not provide a prior judicial hearing before transferring a child from one foster home to another. The court pointed out that New York's procedures included a pre-removal administrative hearing at the local level (18 NYCRR 450.10), the right of appeal to the State agency (Social Services Law, § 400), and the opportunity to stay removal pending article 78 judicial review, as well as the right to an additional pre-removal judicial hearing for children in foster care 18 months or longer (Social Services Law, § 392). *(Id,* at pp 828-832.)

New York's review procedures are more extensive than those found acceptable in *Parham* or *Smith,* especially since ICPC mandates independent review procedures by both the sending and receiving State. While it is conceded that not all of ICPC's requirements were met, such noncompliance, which may, as already noted, give rise to liability, does not imply inadequacy of the review and challenge procedures themselves.

Moreover, we refuse to accept the notion, implicit in Special Term's determination, that New York's present review procedures are constitutionally adequate for in-State placements but constitutionally infirm merely because the placement crosses a State line. Furthermore, Special Term's finding that out-of-State placements "effectively, in many if not most instances, preclude visitation" is not factually supported in this record, since at the time of the motion individual case records had not yet been compiled. Consequently, and at plaintiffs' urging, Special Term apparently took judicial notice that out-of-State placement makes visitation less convenient than in-State placement. Although many factors may affect visitation, of which distance and the availability of travel funds and

mass transportation are only a few, the mere crossing of a State boundary is not determinative. Nor should such a finding have been made without a factual review as to the adequacy of the city's visitation program, in terms of providing children's home visits and parental visitation at the out-of-State placement facility.

We recognize, of course, that New York's review procedures fall short of providing the type of review and challenge which plaintiffs seek. They advocate a preplacement hearing to determine whether out-of-State placement is in the child's best interests, whether it would produce undue hardship, and whether equivalent facilities are available within the State.

A review procedure is not constitutionally defective, however, merely because alternate proposals might offer more elaborate or comprehensive review mechanisms. Due process is satisfied if the procedure adequately safeguards any interest which is constitutionally protected. We find that New York, in its assumption of the parental role, has adequately protected, in terms of due process, whatever interests the child or the parent might have.

To appreciate fully plaintiffs' dissatisfaction with New York's present procedures for out-of-State placement, it is important to recognize that at the core of their arguments is their claim to a statutory and constitutional right to care identical to their treatment needs, i.e., entitlement to an individualized treatment plan with a complete range of appropriate clinical treatment, including "education, training and habilitation." The availability of such a program is one of the preplacement determinations for which, they argue, provision must be made in any review and challenge procedure. Yet, the New York Legislature has given children in foster care, whether placed voluntarily or involuntarily, only the right to adequate care from their local social services agency. (Social Services Law, §§ 395,[9] 398, subd 2, par [b].) This right includes medical treatment as needed (Social Services Law, § 398, subd 6, par [c]), and access to mental health services (Social Services Law, § 398, subd 4).[10]

---

**9.** Plaintiffs' reliance on the statutory reference to "assistance and care", as affording a right to treatment is misplaced. The section's full reference is to "children who are in need of public assistance and care." Subdivision 20 of section 2 of the Social Services Law defines "public assistance and care" as, *inter alia,* cash assistance under aid programs and institutional child care, without reference to treatment.

**10.** State Social Services has promulgated regulations which use the words "care", "treatment" and "provision of services" interchangeably. (See 18 NYCRR Part 427.)

On the other hand, the Legislature has granted a specific right to treatment to children adjudicated juvenile delinquents and PINS for antisocial behavior (Family Ct Act, § 712, subd [g]), as well as to those persons in mental health facilities (Mental Hygiene Law, § 33.03). In fact, a proceeding to adjudicate a person a juvenile delinquent or PINS is commenced by the filing of a petition alleging, *inter alia,* that the respondent requires "supervision, treatment, or confinement" (Family Ct Act, § 731, subd 1, par [c]) or "supervision or treatment" (Family Ct Act, § 732, subd [c]), respectively. Presumably, in authorizing the Family Court to order "treatment" of delinquents and PINS children,[11] and in vesting it with a broad range of authority to give children within its jurisdiction "such care, protection and assistance as will best enhance their welfare" (Family Ct Act, § 255), the Legislature intended to provide a right to treatment related to the antisocial behavior for which the child is being deprived of his liberty. Thus, the statutory right of such children to treatment is measured by their need for rehabilitation. (See *Matter of Lavette M.,* 35 NY2d 136, 141, 142, *supra.)* Since children in foster care, such as plaintiffs, do not have the same need of rehabilitative treatment for antisocial behavior as a delinquent or PINS child and cannot be subjected to the same degree of deprivation of liberty, such as commitment to a training school or secure facility, a rational basis exists for the statutory distinction between the delinquent or PINS child's right to rehabilitative treatment and the foster child's right to basic care. (Social Services Law, §§ 395, 398, subd 2, par [b]; NY Const, art XVII, § 1.)[12]

It may well be, as plaintiffs contend, that the proof will show their handicaps to be such that the appropriate "care" which they require is identical to what would be required to provide them with "treatment." But the point is that they are not statutorily entitled to an individualized plan of treatment and must take the care which they require from the programs the Legislature has made available.

---

11. The question of whether the recent amendments to section 712 of the Family Court Act (L 1976, ch 878, § 3; L 1977, ch 283, §§ 5, 9; L 1977, ch 360, § 11; L 1978, ch 478, § 2; L 1978, ch 481, § 47; L 1979, ch 411, § 24; L 1979, ch 531, § 1) allowing delinquents to be held for purposes of confinement, were intended to remove the prior statutory right to treatment is not an issue here.

12. "The aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine."

Plaintiffs also claim a constitutional right to treatment. As already noted, Special Term agreed and held that "once a State assumes the burden of *parens patriae* and places or commits a child to some custodial setting, [it] has an obligation to provide the necessary and proper care and treatment for the child." (98 Misc 2d 28, 40.) Aside from the fact that a right to treatment as a *quid pro quo* for a child's loss of liberty is a "discredited concept" (see *Matter of Quinton A.,* 68 AD2d 394, 403), the cases relied upon by Special Term in support of the theory are inapposite. *Matter of Lavette M.* (35 NY2d 136, 141, *supra)* involved "the statutory right to 'supervision' and 'treatment' " of PINS children, as did *Martarella v Kelley* (349 F Supp 575). *People ex rel. Hutchings v Smith* (50 AD2d 1097) dealt with an adult prisoner whose sentence was contingent on his response to mental health treatment. *Rouse v Cameron* (373 F2d 451) involved an adult involuntarily committed to a mental hospital for treatment.

On the other hand, case law indicates that children do not have a constitutional right to a particular kind of care from the State and that what rights they do have are limited by the facilities and funds made available by the Legislature. (See, e.g., *San Antonio School Dist. v Rodriguez,* 411 US 1, holding that education is not a fundamental constitutional right under the United States Constitution; *Black v Beame,* 419 F Supp 599, holding that a right to a welfare system shaped to be "least restrictive" of recipients' rights does not exist; *Child v Beame,* 412 F Supp 593, holding that no constitutional right to a particular kind of foster-care system exists; *Matter of Levy,* 38 NY2d 653, 658, 660, holding that while education is a right it is not a fundamental right; the Legislature may set priorities as amongst those in need, especially where the financial resources available to State government are not unlimited; *Bowen v State Bd. of Social Welfare of State of N. Y.,* 45 NY2d 402, 407-408, involving the "dumping" of mentally ill persons on communities, where the court, recognizing the State's fiscal problems and the complexities of theories and programs for the deinstitutionalization of the mentally ill, refused to become embroiled in the administration of such a program, the primary responsibility for which lay in the executive branch of government, and dismissed a complaint seeking declaratory and injunctive relief.)

The Supreme Court of Rhode Island has held that a child's right to mental health treatment is limited by budgeting

considerations and to those services the Legislature provides *(Matter of Doe,* 390 A.2d 390, 395-396 [RI]), while the Appellate Division of the Superior Court of New Jersey found that a juvenile has no right to treatment unless he has been confined for the purpose of particular treatment. In such a case his right would be limited to the facilities made available by the Legislature *(State in the Interest of D. F.,* 145 NJ Super 381).

■ ■ We hold, therefore, that plaintiffs' rights are limited to the programs the Legislature has made available and the existence of a bona fide treatment program at the foster-care facility. "It should not be [in the judicial] province to determine what is the best possible treatment or to espouse an ideal but perhaps unattainable standard." *(Matter of Lavette M.,* 35 NY2d 136, 142, *supra.)* Although the responsibility for providing foster care is placed with the local social services districts and not State Social Services (Social Services Law, § 395), Special Term properly denied the motion to dismiss the complaint against defendant Toia, the Commissioner of State Social Services and Compact Administrator, in his representative capacity. In view of the allegations of the complaint, the conceded noncompliance with ICPC provisions in plaintiffs' placements out-of-State and the question of State Social Services' approval of these placements, a factual issue is presented as to Toia's liability as commissioner and compact administrator for any denial of plaintiffs' statutory rights to adequate care.

■ Special Term, however, refused to dismiss the complaint against Toia in his individual capacity. Plaintiffs allege that their placement in out-of-State facilities in violation of New York's statutory provisions was done with Toia's knowledge. Notwithstanding any knowledge of the illegality of the placement, Toia is entitled to immunity from personal liability for discretionary and quasi-judicial acts and the complaint against him in his individual capacity should have been dismissed.

■ The general rule in New York relating to a public official's immunity has been stated as follows: "A public official may be held liable in damages for a wrongful act only where such act is ministerial in nature. Where, however, an act is discretionary or quasi-judicial in nature no liability attaches even if the act was wrongfully performed * * * In ascertaining whether a specific act is either ministerial or discretionary, it is well settled that 'Each case must be de-

cided on the circumstances involved, the nature of the duty, the degree of responsibility resting on the officer, and his position in the municipality's table of organization' " *(Movable Homes v City of North Tonawanda,* 56 AD2d 718, citing *Rottkamp v Young,* 21 AD2d 373, 375, affd 15 NY2d 831.) Even if a public official knows that his act might be wrong, the rule of immunity is not vitiated: "[T]he well-settled rule of law [is] that no public officer is responsible in a civil suit for a judicial determination, however erroneous or wrong it may be, or however malicious even the motive which produced it." *(East Riv. Gas & Light Co. v Donnelly,* 93 NY 557, 559.)

The selection of an appropriate placement for a child, either in-State or out-of-State pursuant to ICPC, is a matter of judgment, involving the exercise of executive discretion with due consideration to State policy, and the availability of suitable facilities and adequate funds. Even if wrong, such a decision does not give rise to personal liability. That article IV of ICPC provides for the imposition of a penalty for a violation of ICPC terms in an out-of-State placement is no reason to deny a public official the immunity to which he is otherwise entitled. Nor does it transmute the character of the public official's judgment from quasi-judicial to ministerial.

Accordingly, the order, Supreme Court, New York County (DONTZIN, J.), entered January 26, 1979, which, *inter alia,* granted plaintiffs' motion for partial summary judgment, should be modified, on the law, without costs or disbursements, to declare constitutional the out-of-State placement of foster-care children pursuant to ICPC, to grant defendant Toia's motion to dismiss the complaint against him in his individual capacity, to remand for trial and, except as thus modified, affirmed.

FEIN, J. P., MARKEWICH, LUPIANO and BLOOM, JJ., concur.

Order, Supreme Court, New York County, entered on January 26, 1979, modified, on the law, to declare constitutional the out-of-State placement of foster-care children pursuant to ICPC, to grant defendant Toia's motion to dismiss the complaint against him in his individual capacity, and to remand for trial, and, except as thus modified, affirmed, without costs and without disbursements.