NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 21

No. 2020-287

In re S.R., Juvenile

Supreme Court

On Appeal from
Superior Court, Chittenden Unit,
Family Division

March Term, 2021

Thomas J. Devine, J.

Adele V. Pastor, Barnard, for Appellant.

Sarah F. George, Chittenden County State's Attorney, and Andrew Gilbertson, Deputy State's
 Attorney, Burlington, for Appellee.

PRESENT: Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.

¶ 1.    **ROBINSON, J.**    Juvenile S.R. appeals the family division's order granting the request of the Department for Children and Families (DCF) to place him in a secure out-of-state psychiatric residential treatment facility pursuant to 33 V.S.A. § 5926. We conclude that the order was not supported by sufficient evidence and reverse and remand for further proceedings.

¶ 2.    S.R. was born in April 2004 and is sixteen years old. Prior to the beginning of this proceeding, he lived with his mother, with whom he has a close relationship. His father is deceased.

¶ 3.    In October 2019, DCF filed a petition alleging that S.R. was a child in need of care or supervision (CHINS). The court issued emergency and temporary care orders giving custody of S.R. to DCF. In November 2019, mother stipulated that S.R. was CHINS. The stipulated merits

order indicated that S.R. and mother were homeless, mother needed to undergo a medical procedure that would preclude her from caring for S.R., and S.R. had mental health and behavioral needs that needed continued treatment. The stipulated order included a statement that as of October 7, 2019, S.R. did not meet criteria for voluntary or involuntary mental health admission. Mother stipulated that she was unable to meet S.R.'s needs for stability, housing, and mental and behavioral health services.

¶ 4. The October 2020 order on appeal addressed disposition and permanency case plans, as well as DCF's emergency motion to authorize it to place S.R. in a psychiatric residential treatment facility in Virginia. Following a hearing consisting of testimony from three DCF employees, S.R., and mother, the court made the following findings.

¶ 5. DCF had difficulty obtaining S.R.'s records from prior treatment providers because the family had been transient for a long period of time. DCF placed S.R. at the Vermont Assessment Center in Newbury (VACN), a ninety-day assessment program, to obtain a current assessment of his psychological and behavioral needs. By the time of the first disposition hearing in January 2020, however, S.R. had been asked to leave VACN before an assessment was completed, so the disposition hearing was rescheduled.

¶ 6. According to DCF, S.R. was asked to leave VACN because he refused to engage or get out of bed and was verbally aggressive toward staff and peers. S.R. denied these allegations; he explained that he suffers from anxiety and insomnia, which is why he sometimes does not get out of bed, and testified that he was the victim of bullying, and that staff did not protect him when he complained. The court was unable to determine why S.R.'s placement at VACN fell through, but the result was that DCF did not get a psychiatric or psychological assessment as planned.

¶ 7. After leaving VACN, S.R. was placed at a residential facility in Bennington. On the date of the rescheduled disposition hearing in February 2020, S.R. was in crisis at the Brattleboro Retreat after having allegedly assaulted a staff member at the residential facility in

2

Bennington. He was charged with delinquency as a result of this incident. The court continued the disposition hearing due to S.R.'s absence.

¶ 8. The COVID-19 pandemic then struck, delaying court hearings. Over the following months, S.R. moved through a series of ten to twelve placements. The constant changes in placement prevented S.R. from establishing any therapeutic connections with service providers and also inhibited S.R.'s educational progress.

¶ 9. There were times when S.R. was admitted to the Brattleboro Retreat. During these visits, he was seen by a psychiatrist who recommended medication. S.R. did not want to take medication due to potential side effects. Even without medication, however, he appeared to make progress at the Retreat. He received regular therapy and expressed interest in engaging. Unfortunately, the Retreat could not serve as a long-term placement for S.R.; it could only offer short-term stabilization services. After being discharged from the Retreat, S.R. "soon returned to a cycle of sleeplessness, withdrawal, frustration, and escalation."

¶ 10. In June 2020, S.R. was charged with delinquency after he reportedly became escalated and damaged a door. In July 2020, he put his head through a window and tried to cut himself with shards of glass. He also reportedly kicked doors, punched walls, broke a television, and attempted to destroy other property. In September 2020, S.R. was charged with delinquency after he allegedly punched a case worker in the face. During the October 6, 2020 hearing, he participated by telephone from the hospital because he had punched a wall the night before and injured his hand.

¶ 11. A DCF client placement specialist testified that due to S.R.'s behavior, some Vermont programs became unwilling to provide services to him. She presented S.R.'s case to the Case Review Committee, an interagency administrative body that considers coordinated services for youth with significant needs. The Case Review Committee determined that S.R. needed a

higher level of care than the Vermont programs could offer and recommended that he be placed at a psychiatric residential treatment facility.

¶ 12. There are no psychiatric residential treatment facilities that provide services to minors in Vermont. DCF explored placing S.R. at facilities in Massachusetts and Pennsylvania, but he was not accepted by those programs. DCF did not explore placement in New York because DCF does not have contracts with any psychiatric residential treatment facilities there. S.R. was eventually accepted at facilities in Florida; Newport News, Virginia; and Harbor Point, Virginia.

¶ 13. DCF recommended placement at the Harbor Point facility, which would provide S.R. with psychiatric care and would not require him to take medication. The court found that the facility offered strong therapeutic programming and could meet S.R.'s educational needs. The facility also offered adequate family therapy for S.R. and mother. Mother testified that she was concerned about the distance, but following the disposition hearing, she withdrew her initial objection to the placement. S.R.'s guardian ad litem also expressed his support for the placement.

¶ 14. S.R. objected to placement at Harbor Point, and to any other placement out of state, unless a program could be found in New York, where his mother was living at the time of the hearing. He testified that he was eager to return to his mother's care and believed that their previous conflicts were a thing of the past.

¶ 15. The court concluded that mother had made progress by securing housing, engaging in individual counseling, and getting medical care. However, it found that S.R. had not yet made adequate progress since entering DCF custody due to the lack of stable therapeutic programming. During his year in DCF custody, S.R. had yet to complete an assessment, and had not had the benefit of a sustained therapeutic connection. S.R had brief periods of positive engagement (such as his stays at the Brattleboro Retreat), but overall his condition had deteriorated. He had begun having aggressive and violent outbursts, and those behaviors resulted in a narrowing of his placement options. The court maintained the case plan goal of reunification with mother, and

concluded that it was in S.R.'s best interests to remain in DCF custody for another nine months because he was not able to maintain day-to-day functioning. The court granted DCF's motion for out-of-state placement, finding that there were no equivalent facilities in Vermont and that placement at Harbor Point was in S.R.'s best interest and would not cause undue hardship.

¶ 16.    On appeal, S.R. argues that the court erred in granting the motion for out-of-state placement in the absence of any psychiatric or psychological evaluation supporting a conclusion that psychiatric residential treatment was necessary for him. S.R. argues that such evidence is required to support a determination that placement at the Harbor Point facility is in his best interest pursuant to the statute governing placement of neglected or unmanageable children out of state. See 33 V.S.A. § 5926. He contends that his placement is akin to the involuntary commitment of an adult, and that involuntary commitment decisions must be supported by full psychiatric evaluations and expert testimony. In his reply brief, S.R. expands this argument, suggesting that the statutes governing involuntary commitment proceedings apply to minors as well as adults. See, e.g., 18 V.S.A. § 7101(17) (defining person in need of treatment as "a person" who meets various criteria, with no age qualification). For this reason, S.R. argues that DCF should have gotten a psychiatric evaluation of him within twenty-four hours of his first admission to the Brattleboro Retreat. See 18 V.S.A. § 7508.

¶ 17.    The State argues that the trial court had sufficient basis to conclude that no local program could meet S.R.'s needs, and that it was in S.R.'s best interest to be placed at Harbor Point given the inability of the many different Vermont-based programs where he was placed to address his behavioral and psychological needs so that he could progress toward the reunification goal.

¶ 18.    We understand the dispute between the parties to hinge on the level of care S.R. requires. The State essentially argues that S.R. needs to be in a psychiatric residential treatment facility, that there are no such facilities in Vermont, and that the Harbor Point placement is the best

5

available option. S.R. contends that the State has not presented sufficient evidence that he needs psychiatric residential treatment, and he seeks a placement in a residential treatment facility closer to his mother.

¶ 19. In assessing the record in light of the parties' arguments, we consider the specific statute governing interstate placements of children, as well as the particular considerations that apply when placing an adolescent who is approaching adulthood into a psychiatric treatment facility against his will. In particular, we conclude that where, as here, the State seeks to place an adolescent out of state in a locked psychiatric residential treatment facility on a long-term basis, and the child objects to such a placement, the State must present expert evidence to support its request. Because the State did not present such evidence in the trial court and the existing record was insufficient for the court to conclude that such a placement was in S.R.'s best interest, we must reverse and remand for further proceedings. In the meantime, we mandate that, absent stipulation of the parties and until further order of the trial court, S.R. remain in the contested placement pending further proceedings on remand. We consider these points more fully below.

## I. Legal Framework

¶ 20. The statute directly implicated by the State's proposed placement and S.R.'s objection gives DCF the authority to place a child, who is in DCF custody due to neglect, in a treatment facility in another state. See 33 V.S.A. § 5926 (giving "officers and agencies of this State having authority to place neglected or unmanageable children" power to place child in another state); see also id. § 5106(4) (granting DCF authority to place children "in a family home or a treatment, rehabilitative, detention, or educational facility or institution"). The statute gives the child the right to a hearing prior to out-of-state placement upon request:

> [U]nless parental rights have been judicially terminated any such child being placed in another state pursuant to this compact shall, upon request, be given a court hearing on notice to the parent or guardian with opportunity to be heard prior to his or her being sent to such other state for care and the court finds that:

6

> (1) equivalent facilities for the child are not available in this State;
>
> (2) care in the other state is in the best interest of the child and will not produce undue hardship.

33 V.S.A. § 5926.

¶ 21. Section 5926 is one of several statutory provisions that relate to the Interstate Compact on the Placement of Children (ICPC), which Vermont adopted in 1971. See 1971, No. 219 (Adj. Sess.). The provision is modeled on Article VI of the ICPC, which permits out-of-state placement of delinquent children and contains identical notice, hearing, and findings requirements. See 33 V.S.A. § 5906. However, § 5926's extension of the ICPC procedure to out-of-state placement of "neglected or unmanageable children" appears to be unique to Vermont. See Sinhogar v. Parry, 412 N.Y.S.2d 966, 974 (Sup. Ct. 1979), aff'd as modified, 427 N.Y.S.2d 216 (App. Div. 1980), aff'd as modified, 425 N.E.2d 826 (N.Y. 1981) (noting that ICPC contains hearing requirement for out-of-state placement of children adjudicated delinquents, but does not require similar hearing for children in need of care or treatment).

¶ 22. We have had occasion to interpret § 5926 only twice, and have never addressed the applicable standard of review or what evidence is required to support a § 5926 finding. See In re M.C., 2018 VT 139, ¶ 12, 209 Vt. 219, 204 A.3d 1123 (holding that child whose parents had voluntarily relinquished their rights had right to hearing under § 5926 prior to out-of-state placement in residential facility); In re A.K., 153 Vt. 462, 464, 571 A.2d 75, 77 (1990) (holding that in contrast to child whom DCF sought to place out of state, parents were not entitled to hearing regarding child's out-of-state placement).

¶ 23. In applying this statute to the interstate placement at issue in this case, we are mindful of the particular considerations that apply when placing a child in a secure psychiatric residential treatment facility, as opposed to other kinds of interstate placements. The minor's substantial liberty interest, which calls for more robust protections as a minor approaches adulthood, necessarily informs the best-interest analysis.

7

¶ 24. The United States Supreme Court explained over thirty years ago that "[i]t is not disputed that a child, in common with adults, has a substantial liberty interest in not being confined unnecessarily for medical treatment and that the state's involvement in the commitment decision constitutes state action under the Fourteenth Amendment." Parham v. J. R., 442 U.S. 584, 600 (1979).[1] In Parham, the Court concluded that due process did not require a formal judicial hearing before a judge in order to admit a child to a mental hospital. However, it held that at a minimum, when a parent or the State seeks to have a child institutionalized for mental health care, there must be an inquiry by a neutral factfinder "to determine whether the statutory requirements for admission are satisfied." Id. at 606. The Court described the necessary inquiry in more detail:

> That inquiry must carefully probe the child's background using all available sources, including, but not limited to, parents, schools, and other social agencies. Of course, the review must also include an interview with the child. It is necessary that the decisionmaker have the authority to refuse to admit any child who does not satisfy the medical standards for admission. Finally, it is necessary that the child's continuing need for commitment be reviewed periodically by a similarly independent procedure.

Id. at 606-07. The Court specifically contemplated a review by a physician, emphasizing that "[w]hat is best for a child is an individual medical decision that must be left to the judgment of physicians in each case." Id. at 608. It noted that "the determination of 'whether a person is mentally ill turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists.'" Id. at 609 (quoting Addington v. Texas, 441 U.S. 418, 429 (1979) (alteration omitted)).

¶ 25. Other courts have applied these principles in analogous situations. For example, the Supreme Court of Pennsylvania upheld an order committing a minor to an involuntary drug treatment program against a due process challenge in In re F.C. III, 2 A.3d 1201, 1219-20 (Pa.

---

[1] Although he likens the court's order to an order for involuntary hospitalization, S.R. has not directly argued that his placement violates his due process rights. We cite this authority only because these considerations help frame our analysis of the "best interest" question under 33 V.S.A. § 5926.

2010). The court noted that the statute required an assessment regarding inpatient treatment by "a psychiatrist, a licensed psychologist with specific training in drug and alcohol assessment and treatment, or a certified addiction counselor," and that it called for a formal adversarial proceeding pursuant to a clear-and-convincing-evidence standard of review. Id. at 1219. See also Matter of Commitment of N.N., 679 A.2d 1174, 1187 (N.J. 1996) (concluding that involuntary commitment of minor under age of fourteen requires showing by clear and convincing evidence that minor is mentally ill, that child is in need of intensive, institutional psychiatric treatment that cannot be provided in home, community, or on outpatient basis, and that minor's mental illness poses danger to minor or others—understood broadly to include the substantial likelihood of significant developmental harm in the absence of treatment).

¶ 26. Significantly, courts have also recognized that the weight given to a child's liberty and autonomy interests increases as a child approaches adulthood. See, e.g., In re Roger S., 569 P.2d 1286, 1292 (Cal. 1977) (en banc) (presuming that minors age fourteen and older have sufficient capacity to exercise due process rights with respect to institutionalization for mental health treatment). As the New Jersey Supreme Court explained in N.N., "children possess certain constitutionally protected liberties, and . . . the weight and significance of those liberties increase with the age of the child." 679 A.2d at 1187. The court acknowledged that "there is some degree of arbitrariness in determining at what age a child should be subject to adult hospitalization procedures," and for various reasons concluded that under New Jersey law the age of fourteen is the appropriate cut-off for an age-differentiated standard. Id. (quotation omitted).

¶ 27. In fact, nothing in Vermont's statutes relating to involuntary mental health treatment indicates that the statutes do not apply to minors. As S.R. notes, the definition of a "person in need of treatment" contains no age-based qualifiers. See 18 V.S.A. § 7101(17). This is in contrast to other provisions, such as one providing that "[a]ny person 14 years of age or over may apply for voluntary admission to a designated hospital for examination and treatment." Id.

9

§ 7503. Pursuant to those statutes, a person cannot be subjected to involuntary mental health treatment unless the court finds by clear and convincing evidence that the person is in need of treatment, meaning that the person has a mental illness and, as a result of that illness, poses a danger of harm to self or others. Id. §§ 7101(17), 7611; 7617. Such a finding must be based on the evaluation of a qualified mental health professional. Id. § 7614 (requiring psychiatric examination of proposed patient). These due process protections are required in commitment proceedings "not only because an individual stands to be deprived of [] physical liberty but also because of the negative social consequences that may result" from the involuntary treatment. In re W.H., 144 Vt. 595, 597, 481 A.2d 22, 24 (1984). They reflect a recognition that involuntary commitment "represents a massive curtailment of liberty necessitating a heightened standard of proof." In re N.H., 168 Vt. 508, 511, 724 A.2d 467, 469 (1998).

¶ 28. We recognize that psychiatric residential treatment facilities are not necessarily as restrictive as hospitals. See Use of Restraint and Seclusion in Psychiatric Residential Treatment Facilities Providing Psychiatric Services to Individuals Under Age 21, 66 Fed. Reg. 7148-01, 7148 (Jan. 22, 2001) (to be codified at 42 C.F.R. pts. 441 and 483) (noting that psychiatric residential treatment facilities "are rapidly replacing hospitals in treating children and adolescents with psychiatric disorders" and "are generally a less restrictive alternative to a hospital for treating children and adolescents whose illnesses are less acute but who still require a residential environment"); see also 42 C.F.R. § 483.352 (defining psychiatric residential treatment facility as "a facility other than a hospital, that provides psychiatric services . . . to individuals under age 21, in an inpatient setting"). But, at least in this case, the facility at issue will provide psychiatric care in the context of a locked facility. Federal regulations regarding Medicaid coverage for inpatient psychiatric services for individuals under age twenty-one require the same certifications whether the services are provided by a psychiatric hospital or a psychiatric residential treatment facility. See 42 C.F.R. §§ 441.150-441.153 (requiring independent team that "[i]ncludes a physician; [h]as

10

competence in diagnosis and treatment of mental illness, preferably in child psychiatry; and [h]as knowledge of the individual's situation" to certify that resources in community do not meet treatment needs, beneficiary's psychiatric condition requires services on inpatient basis under direction of physician, and services can reasonably be expected to improve beneficiary's condition or prevent further regression). In short, the difference between a hospital and a psychiatric residential treatment facility from the perspective of an adolescent's interest in autonomy is only a matter of degree.

¶ 29.    We do not purport to address whether S.R.'s placement implicates due process or Vermont statutes relating to involuntary treatment.[2]  But in applying 33 V.S.A. § 5926 to the facts of this case, we cannot ignore this constitutional and statutory backdrop, and the competing values it seeks to balance.  The statute governing interstate placement of children requires the court to find that no equivalent facilities are available in Vermont and that the placement is in the child's best interest and will not cause undue hardship.  33 V.S.A. § 5926.  We conclude that, in a CHINS case, at least with respect to a child on the cusp of adulthood, in order to establish that a long-term placement in a locked psychiatric residential treatment facility in another state is in a child's best interest, the State must present evidence of an expert evaluation or opinion that the minor has a psychiatric condition and needs long-term, intensive, institutional psychiatric treatment that cannot be provided in a less restrictive environment.

¶ 30.    We recognize that § 5926 does not expressly reference the mental health statutes or require any particular showing beyond "best interest" when placing a child in a secure psychiatric facility in another state against the child's wishes.  This is not entirely surprising, because the statute governs not just placements in locked psychiatric residential treatment facilities but all out-

---

[2]  S.R. did not suggest that the placement violates his statutory rights under the involuntary commitment statute until his reply brief.  Thus, we do not consider the question.  See Bigelow v. Dep't of Taxes, 163 Vt. 33, 37, 652 A.2d 985, 988 (1994) (declining to reach argument raised for the first time in reply brief on appeal).

of-state juvenile placements. Such placements could include treatment, rehabilitative, or educational programs that do not involve the curtailment of liberty associated with involuntary mental health treatment. In those cases, psychiatric assessments or expert testimony may not necessarily be required for DCF to meet its burden of demonstrating that the out-of-state placement is in a child's best interest.

¶ 31. But in a case such as this one where DCF proposes to place a child in an out-of-state locked psychiatric residential treatment facility, and the child objects, evidence of a determination by a qualified mental health professional is required to support a finding that the placement is in the child's best interest. This requirement is necessary to protect the child's "substantial liberty interest in not being confined unnecessarily for medical treatment." Parham, 442 U.S. at 600. It is also necessary to ensure that the child, particularly an adolescent such as S.R., "believes that he or she is being listened to and that his or her opinion is respected and counts." M.W. v. Davis, 756 So. 2d 90, 108 (Fla. 2000) (concluding that Florida's statutory procedure for involuntary civil commitment did not apply when state sought to place child in its custody in psychiatric residential treatment facility, but that child was entitled to meaningful opportunity to be heard).

## II. Application to this Case, and Mandate

¶ 32. The evidence presented to the trial court at disposition did not meet this standard. Although S.R. was in DCF custody for nearly a year prior to the disposition hearing, DCF did not get a psychiatric evaluation or present any expert testimony whatsoever to support its contention that S.R. needed to be placed in a locked psychiatric residential treatment facility. There was no evidence that S.R. had an identified psychiatric condition requiring long-term involuntary care. The State's main evidence that residential psychiatric treatment was required consisted of testimony from a DCF case worker that DCF's internal Case Review Committee recommended

12

placement in a psychiatric residential treatment facility, and evidence of S.R.'s escalating behaviors in his various placements during his time in DCF custody.

¶ 33. With respect to the Case Review Committee's recommendation, there was no evidence that the Committee included any psychiatrists or psychologists, or that anyone from the Committee met with S.R. A DCF witness testified that the Committee included representatives from the Department for Mental Health, the Department of Aging and Independent Living, and the Agency of Education, a "parent rep," and several client placement specialists from DCF; but DCF offered no evidence as to the qualifications of any of these members to diagnose juvenile mental illness and propose a treatment plan. Furthermore, given DCF's admitted inability to obtain S.R.'s past treatment records, it is not clear what information the Committee used to make its recommendation.

¶ 34. With respect to S.R.'s escalating behaviors, we do not question that the concerning behaviors may have warranted short-term steps to stabilize and further evaluate S.R. Some of these behaviors, if proven, might well be critical factors supporting an expert's opinion that S.R. requires long-term inpatient psychiatric treatment. But in the absence of expert analysis, we cannot agree that the behaviors, by themselves, are sufficient to establish that long-term treatment in a secure psychiatric residential treatment facility is warranted. Cf. Addington, 441 U.S. at 429 ("[W]hether the individual is mentally ill . . . turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists.").

¶ 35. DCF's failure to provide expert evidence in this case is puzzling. S.R. had at least two admissions to the Brattleboro Retreat, and received psychiatric care there within five months of the disposition hearing. Moreover, S.R.'s various moves do not explain DCF's apparent failure to gather many of the potentially relevant medical records. The counselor who treated S.R. for a period before he came into DCF custody was known to DCF, and DCF had direct access to the records from S.R.'s various short-term placements, as well as the Brattleboro Retreat. S.R.'s own

13

behavior may have interfered with DCF's initial effort to secure a comprehensive assessment from a qualified expert at VACN—a matter on which the trial court was unable to make a finding—but DCF's failure to try again to secure an expert assessment of S.R.'s medical needs even while it was advocating to place S.R. in a secure psychiatric residential treatment facility is confounding. While we have no doubt that everyone involved in the proceeding below was concerned with S.R.'s best interest and acted in good faith, and it may be that DCF's position is ultimately adequately supported, the record simply does not contain the sort of expert evidence required to support long-term placement in a locked psychiatric residential treatment facility over S.R.'s objection. We therefore reverse and remand the court's order granting out-of-state placement for further proceedings consistent with this opinion.

¶ 36. Notwithstanding our reversal of the trial court's decision approving the out-of-state placement, given the frequent upheavals and multiple placements S.R. has gone through, the challenges DCF has faced in finding appropriate in-state placements, and the lack of identified alternatives, unless and until the trial court orders otherwise, we hold that DCF may maintain S.R. in the Virginia facility pending a decision following a new hearing in the trial court. Based on testimony that S.R. would have his first treatment team meeting at Harbor Point within twenty-eight days of admission, we are mindful that by now S.R. likely has undergone a thorough evaluation by qualified experts at Harbor Point, and DCF and S.R. likely have ready access to expert opinions concerning his needs. We direct the trial court to schedule further proceedings as soon as reasonably possible.

Reversed and remanded for further proceedings consistent with this opinion.

FOR THE COURT:

_____
Associate Justice

14